Ralph C. HAMM, III, Petitioner, Appellant,

v.

Arthur LATESSA, Superintendent of MCI, et al., Respondents, Appellees.

Ralph C. HAMM, III, Petitioner, Appellee,

v.

Arthur LATESSA, Superintendent of MCI, et al., Respondents, Appellants.

Nos. 94–1999, 94–2018.

United States Court of Appeals, First Circuit.

Heard April 4, 1995.

Decided Dec. 28, 1995.

Daniel S. Tarlow, with whom John F. Tocci and Glovsky & Associates were on brief, for petitioner.

William J. Meade, Assistant Attorney General, with whom Scott Harshbarger, Attorney General, was on brief, for respondents.

Before SELYA, CYR and STAHL, Circuit Judges.

SELYA, Circuit Judge.

Petitioner Ralph C. Hamm, III, is currently serving two concurrent, parole-eligible life sentences in a Massachusetts state penitentiary. He faces an additional twenty-six to forty years in prison from and after the culmination of his life sentences. Hamm solicits a writ of habeas corpus, naming as respondents the superintendent of the state correctional facility where he is confined, the Commissioner of Correction, and the Parole Board (hereinafter collectively the respondent or the Commonwealth), and contending that a policy implemented by the Commonwealth after his incarceration delayed his eligibility for a parole hearing. In his estimation, the change in policy transgressed both due process and the ban on ex post facto laws. The district court rejected the latter claim but granted the writ on due process grounds and ordered, *inter alia*, a *nunc pro tunc* parole hearing.

The petitioner appeals from both the dismissal of his ex post facto claim and from the limited grant of relief. The Commonwealth cross-appeals from the due process ruling and the allowance of *any* relief. We hold that the Commonwealth's implementation of the challenged policy neither abridged the petitioner's rights under the Due Process Clause nor violated the Ex Post Facto Clause. Hence, we reverse the district court's order and dismiss the habeas application.

## I.  BACKGROUND

We divide the introductory section of our opinion into five segments.

### A.  *The Underlying Convictions and Sentences.*

These appeals have their genesis in events that occurred over a quarter-century ago. In 1969, following a bench trial, a Massachusetts court found the petitioner guilty of charges stemming from a brutal attack and robbery that occurred the previous year. A more complete account of the crimes, unnecessary here, is available in *Commonwealth v. Hamm*, 19 Mass.App. 72, 471 N.E.2d 416, 418–19 (1984) (*Hamm I*). The trial court sentenced petitioner to two concurrent, parole-eligible terms of life imprisonment for his convictions on counts of armed robbery and assault with intent to rape, and to a series of consecutive sentences totalling six-

ty-eight to eighty years on the other counts of conviction (including mayhem and assault with intent to murder). These consecutive sentences were to be served "from and after" the life sentences.[1] The appeals court, in an unpublished rescript, reduced the from-and-after sentences to twenty-six to forty years but upheld the convictions and sentences in all other respects.

### B. *The Parole–Eligibility Statute.*

The Massachusetts statute governing the parole eligibility of convicts serving terms of life imprisonment provides (and substantially provided in 1968) that:

> Every prisoner who is serving a sentence for life in a correctional institution of the commonwealth [with specified exceptions not relevant here] shall be eligible for parole, and the parole board shall, within sixty days before the expiration of fifteen years of such sentence, conduct a public hearing before the full membership.
>
> . . . .
>
> After such hearing the parole board may, by a vote of a majority of its members, grant to such prisoner a parole permit to be at liberty upon such terms and conditions as it may prescribe for the unexpired term of his sentence. If such permit is not granted, the parole board shall, at least once in each ensuing three year period, consider carefully and thoroughly the merits of each such case. . . .

Mass.Gen.L. ch. 127, § 133A. Until 1977, the Commonwealth considered inmates who were not only serving life sentences but also facing the grim prospect of overhanging from-and-after sentences as coming within the purview of section 133A. Based on that interpretation of the statute, the Commonwealth granted such inmates parole hearings (for possible parole from their life sentences into their from-and-after sentences) once they had served close to fifteen years. Accordingly, after the state court sentenced Hamm, correctional officials advised him that

the parole-eligibility date referable to his life sentences would be November 28, 1983.[2]

### C. *The 1977 Aggregation Policy.*

In 1977, the Commonwealth recast its interpretation of section 133A. The impetus for change was the decision of the Massachusetts Supreme Judicial Court (SJC) in *Henschel v. Commissioner of Correction,* 368 Mass. 130, 330 N.E.2d 480 (Mass.1975). *Henschel* required the aggregation for parole-eligibility purposes of a prisoner's consecutive county house of correction and state institution sentences. *See id.* 330 N.E.2d at 483–85. The SJC advanced a thoughtful justification in support of aggregation:

> To follow the defendant's [non-aggregation] approach would require the board to make a series of decisions granting parole from one sentence to the next rather than a single decision on the basis of one parole eligibility date for all sentences. The former procedure makes little sense since the decision to grant parole is to be based on whether the board believes the prisoner can live freely outside of prison without violating the law.

*Id.* 330 N.E.2d at 484. The Commonwealth found this rationale to be equally convincing in the context of making decisions to parole prisoners serving life sentences into overhanging from-and-after sentences. Consequently, it rethought its earlier interpretation of section 133A and revised its policies regarding parole eligibility for certain classes of inmates, including lifers who faced impending from-and-after sentences. Under the neoteric policy, such inmates were not regarded as falling under section 133A and would no longer receive parole hearings at the fifteen-year mark; instead, the parole-ineligible portion of the prisoner's life sentence (fifteen years) would be aggregated with the parole-ineligible portion of his from-and-after sentences to arrive at a "real" parole-eligibility date, that is to say, a single

---

1. Sacrificing originality for clarity, we refer herein to this group of sentences as the "from-and-after sentences."

2. The respondent fixed the parole-eligibility date in 1969 and informed the petitioner of it at that

time. It should be noted, however, that, giving credit for time served awaiting trial and sentencing, the Commonwealth deemed the petitioner's effective date of sentence to be November 29, 1968.

date at which a favorable parole decision would result in the prisoner's actual release from incarceration, not just his parole from one sentence into another.[3] While this paradigm was not compelled by the holding in *Henschel* (which did not specifically address the aggregation of life sentences with from-and-after sentences), the respondent determined that the new arrangement more faithfully mirrored the tenets undergirding *Henschel*.

In 1982—the year before Hamm would have received his initial section 133A hearing under the former policy—the Commonwealth applied the new policy to him and recalculated his parole-eligibility date.[4] The aggregation resulted in a single, "real" parole-eligibility date of November 2001.[5] Though this structural change obviated the need for the petitioner to obtain two parole permits to secure his release in 2001, he claims that it also impermissibly deprived him of an opportunity for release at an earlier date.

The petitioner's thesis runs along the following lines. Massachusetts law affords prisoners serving indeterminate terms of years various ways to reduce their sentences. These same options, Hamm claims, are not available to prisoners who are serving life sentences. Thus, if he had been paroled into his (indeterminate) from-and-after sentences in 1983, he could have availed himself of these opportunities and possibly could have gained his freedom earlier than 2001. Under the 1977 policy, however, he effectively remains on "life sentence status" during the full term of his immurement and, therefore, cannot take advantage of these early-release opportunities, which include:

(1) *Establishing a "Wrap-up" Date.* Once paroled into his from-and-after sentences, the petitioner would immediately acquire, subject to divestiture for misconduct, statutory good time under Mass.Gen.L. ch. 127, § 129. This "good time" would be based on the top end of his indeterminate sentences (forty years) and would, the petitioner claims, amount to sixteen and one-half years. He could earn additional good-time credits (up to seven and one-half days per month) by participating in educational and vocational programs.[6] *See* Mass.Gen.L. ch. 127, § 129D. Moreover, the sentencing court (both initially and on resentencing) gave the petitioner 210 days credit on his four from-and-after sentences for pre-

---

**3.** The document explaining the new policy, issued jointly by the Department of Correction and the Parole Board, bore the title "New Policies and Practices Regarding Aggregation of 'From and After' Sentences (Henschel Decision)." It states in relevant part:

[I]t has become necessary to revise existing procedures and policies covering aggregation of "from and after" (i.e. consecutive) sentences for purposes of computing parole eligibility and good conduct deductions.

. . . .

*Life Sentences*
Life sentences on which there is no parole eligibility . . . cannot be aggregated with any other sentences for parole eligibility purposes. Life sentences which do carry parole eligibility . . . *will* be aggregated with other sentences for parole eligibility purposes. . . .

**4.** For much of the life of this litigation, the Commonwealth stubbornly insisted that it aggregated Hamm's sentences pursuant to a different, long-established policy, and that its newly contrived 1977 policy did not effect any change regarding prisoners such as Hamm. Dissatisfied with the record on this point, we retained appellate jurisdiction and remanded for factfinding. The district court conducted an evidentiary hearing and found, on the basis of the petitioner's prison records and testimony from former and current

counsel to the Parole Board, that prior to 1977 the respondent did in fact follow a practice of providing fifteen-year parole hearings to life prisoners facing from-and-after sentences. The Commonwealth now accepts this finding and has recanted its assertion that it did not retroactively subject the petitioner to a new policy.

**5.** The exact manner in which the respondent arrived at this date is inscrutable. The underlying calculation is not revealed in the court papers and Hamm's post–1982 prison records (which from time to time have indicated various parole-eligibility dates ranging from 1999 to 2001) are little help. We need not probe the point too deeply, however, inasmuch as the Commonwealth has not disputed the petitioner's contention that his parole-eligibility date under the 1977 aggregation policy is in November of 2001. Like the district court, we will assume that to be the correct date.

**6.** Good-time credits that a convict earns while serving a life sentence apparently do not reduce his life sentence or his parole-ineligible term; we are told that they are simply "banked" and only become useful to him in the event that his life sentence is commuted to a term of years. Upon parole into a from-and-after sentence, the convict would lose his "banked" good-time credits.

sentence incarceration. Hamm theorizes that this credit applies separately to each of his four from-and-after sentences, yielding an aggregate credit of two years and four months for jail time.

We assume *arguendo* the accuracy of the petitioner's figures without independently verifying them.[7] These potential reductions, totalling twenty-three years and one month, would, if garnered, enable him to leave prison without undergoing a second parole hearing after serving just sixteen years and eleven months on his from-and-after sentences.[8] Hence, if the petitioner had been paroled into his from-and-after sentences in November of 1983, he might have established a wrap-up date in October 2000, thus bringing about his release more than a year earlier than his current aggregated parole-eligibility date.

(2) *Early Parole.* Once paroled into his from-and-after sentences, the petitioner could also reduce the parole-ineligibility period of these sentences, which otherwise would remain at seventeen years and four months. First, he asserts that he would be credited automatically with the same two years and four months of jail time. *But see* note 7, *supra,* and accompanying text. Second, his earned good time would effectively count as time served toward his parole-ineligible term. On this basis, he argues that if he had gained parole from his life sentences in 1983 and earned section 129D credits from then on at the maximum rate, he might have been eligible for "real" parole as early as November of 1995.[9]

(3) *Special Parole.* The petitioner's final opportunity-related theory suggests that aggregation has already deprived him of the possibility of obtaining special consideration parole as early as 1989, after serving just one-third of his from-and-after minimum sentences, less jail credits. *See Hamm v. Commissioner of Correction,* 29 Mass.App. 1011, 564 N.E.2d 1032, 1033 n. 5 (*Hamm II*), *rev. denied,* 409 Mass. 1102, 566 N.E.2d 1131 (1991). The respondent effectively parries this thrust, stating that Hamm may apply for this type of parole consideration even under the 1977 aggregation policy. Finding no evidence in the record that the petitioner has made an effort to apply for special consideration parole, or that the Parole Board would not consider his request, we cannot conclude that aggregation has deprived the petitioner of this benefit. *See id.* Accordingly, we do not further discuss this aspect of Hamm's claim of harm.

### D. *The 1988 Policy.*

The Commonwealth revisited its parole-eligibility policy anent life prisoners facing from-and-after sentences in 1988, and resumed the practice of providing them with parole hearings at or near the fifteen-year mark. A 1990 document prepared by the respondent, entitled "Parole Eligibility Regulations, Policies, Procedures," explains that parole-eligible life sentences are an exception to the general aggregation policy "because of the statutory requirement that a parole hearing be held after a definite period of time." The about-face did not ameliorate the petitioner's professed plight; the respondent declined to apply this policy retroactively because such an application, it feared, might hurt prisoners approaching their aggregated parole-eligibility dates. Thus, Hamm's parole-eligibility date was not recalculated, and he remains incarcerated with no parole hearing on the horizon until November of 2001.

---

7. The record is tenebrous as to many of Hamm's claims, and some of them, e.g., the claim of an entitlement to an 840–day credit for pre-sentence incarceration, strike us as counterintuitive.

8. This optimistic calculation assumes, *inter alia,* that Hamm would earn section 129D good time at the maximum possible rate over the duration of his from-and-after sentences. If Hamm serves sixteen years and eleven months of his from-and-after sentences on his best behavior, he could theoretically accumulate 1,522.5 days of earned good time.

9. The petitioner arrives at this date by taking the following route: 208 months (Hamm's statutory parole-ineligible term) less 28 months (pre-sentence jail credits) less 36 months (maximum possible section 129D credits during first twelve years of from-and-after sentences) = 144 months. If Hamm had begun serving his from-and-after sentences in November of 1983, and if his other assumptions proved true, he had a possibility of securing a parole hearing in November, 1995.

### E. *The Habeas Proceedings.*

The petitioner initiated state habeas proceedings in 1990, arguing, among other things, that the Commonwealth's failure to provide him with a parole hearing in 1983 deprived him of his right to due process of law, and that the 1977 policy, as applied to him, violated the prohibition on ex post facto laws. A state superior court judge dismissed the petition, and the Massachusetts Appeals Court upheld the aggregation of the petitioner's sentences for purposes of determining parole eligibility.[10] *See Hamm II,* 564 N.E.2d at 1033–34. After the SJC denied further appellate review, the petitioner initiated federal habeas proceedings.

The district court found that the Commonwealth had in fact applied a change in the law to petitioner, but it concluded that the change did not harm him and therefore posed no ex post facto problem. On the due process claim, the court took a more receptive stance. It interpreted section 133A as mandating that petitioner receive a parole hearing on his life sentences after fifteen years, and ruled that the Commonwealth's failure to provide him a hearing in that time frame deprived him of due process. The court ordered the state to convene such a hearing *nunc pro tunc,* and to continue convening such hearings at three-year intervals should parole be denied. *See Hamm v. Latessa,* No. 91–10667–WJS, slip op. at 14 (D.Mass. May 18, 1994) (*Hamm III*). The court also decreed that if, despite the serial parole hearings, the petitioner remained in custody beyond 2001, then in such event, the 1977 policy should be applied to him as written from that date forward. *See id.*

## II. ANALYSIS

We bifurcate our analysis, examining each of the petitioner's constitutional claims under a separate heading.

### A. *The Due Process Claim.*

█ The district court found that section 133A applied to the petitioner and afforded him a liberty interest in the convening of a parole hearing in 1983 (as he neared the fifteen-year mark of his life sentences). The court based this finding on its interpretation of section 133A, emphasizing that the statute is written in mandatory and unequivocal terms—"Every prisoner who is serving a sentence for life ... *shall* be eligible for parole, and the parole board *shall,* within sixty days before the expiration of fifteen years of such sentence, conduct a public hearing...." (emphasis supplied)—and makes no exception on its face for life prisoners who also have from-and-after sentences in prospect. To buttress this view, the court noted that the aggregation policy expressed in section 133A could not apply to the petitioner because his life sentences by definition contain no "minimum" sentence, and therefore cannot be aggregated with his from-and-after sentences to determine parole eligibility. Building on this foundation, the court held that the petitioner had an unequivocal statutory right to be considered for parole into his from-and-after sentences once he had served fifteen years of his life sentences, and that the Commonwealth unconstitutionally deprived him of this liberty interest by aggregating his life sentences with his from-and-after sentences and by failing to grant him an initial parole hearing in 1983.

█ We cannot accept the lower court's analysis. It is settled that a statute providing for early release or other benefits under stipulated conditions may sometimes confer upon prison inmates a liberty interest protected by the Due Process Clause.[11] *See*

---

10. The court appeared to misconstrue the petitioner's ex post facto argument; rather than focusing on whether the 1977 policy, as applied, differed materially from the policy in effect in 1968, the court focused on the 1988 policy and ruled that Hamm was not entitled to enjoy its benefits. On this point, the court wrote:

The plaintiff's situation does not present an ex post facto issue. The rules have not been changed adversely to him. Rather, the reverse has occurred: after his offenses and sentencing, a rule has changed in a manner that, if applied to him, would work to his advantage—or so the plaintiff seems to think.

*Hamm II,* 564 N.E.2d at 1034–35.

11. This is so even though, as a general rule, a convict has "no constitutional or inherent right ... to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979). The *Green-*

*Board of Pardons v. Allen,* 482 U.S. 369, 373–81, 107 S.Ct. 2415, 2418–22, 96 L.Ed.2d 303 (1987); *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979); *Wolff v. McDonnell,* 418 U.S. 539, 556–72, 94 S.Ct. 2963, 2974–83, 41 L.Ed.2d 935 (1974); *see also Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 461–62, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989) (restating principle and citing cases but finding no liberty interest created by state regulations governing visitation). At the time the district court issued its order, constitutional doctrine suggested that a state creates such a liberty interest "by establishing 'substantive predicates' to govern official decision-making ... and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Thompson,* 490 U.S. at 462, 109 S.Ct. at 1909 (quoting *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983), and omitting citation). The statute at issue in *Allen,* for example, used "mandatory language ('shall') to 'creat[e] a presumption that parole release will be granted' when the designated findings are made." *Allen,* 482 U.S. at 377–78, 107 S.Ct. at 2421 (quoting *Greenholtz,* 442 U.S. at 12, 99 S.Ct. at 2106) (alterations in original).

■ In recent years, the tectonic plates have shifted. In *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Justices explained that, rather than relying on the presence or absence of mandatory language in determining whether a statute or regulation confers a liberty interest, courts should focus their inquiry on the nature of the interest allegedly created by the state. *See id.* at —— – ——, 115 S.Ct. at 2297–3000. State-created liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2300 (citations omitted).

■ While the question of whether a state law creates a liberty interest protected by the Due Process Clause is clearly one of federal constitutional law, the preliminary question of parsing the state law to determine its substance is not within the primary domain of a federal habeas court. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991). Federal courts "are bound by a State's interpretation of its own statute." *Garner v. Louisiana,* 368 U.S. 157, 166, 82 S.Ct. 248, 253, 7 L.Ed.2d 207 (1961). Particularly relevant here is *Hebert v. Louisiana,* 272 U.S. 312, 47 S.Ct. 103, 71 L.Ed. 270 (1926). In *Hebert,* a convicted defendant claimed that a state court's incorrect construction of state law led to the imposition of a more onerous sentence and thereby violated the Due Process Clause. The Court rejected that claim, stating:

> Whether state statutes shall be construed one way or another is a state question, the final decision of which rests with the courts of the State. The due process of law clause in the Fourteenth Amendment does not take up the statutes of the several States and make them the test of what it requires; nor does it enable this Court to revise the decisions of the state courts on questions of state law.

*Id.* at 316, 47 S.Ct. at 104. The rule, then, is that a federal habeas court will not disturb the state courts' construction or application of state law unless it can be shown that such construction or application offends the Constitution or some (applicable) federal statute. *See Bowser v. Boggs,* 20 F.3d 1060, 1065 (10th Cir.1994); *Smith v. McCotter,* 786 F.2d 697, 700 (5th Cir.1986); *cf. Martinez v. California,* 444 U.S. 277, 282, 100 S.Ct. 553, 557, 62 L.Ed.2d 481 (1980) (explaining that a state's interest in fashioning its own rules of state law is paramount to any federal interest *except* protecting individuals from state action that is wholly arbitrary and irrational).

Given the clearly demarcated boundaries of federal habeas review, the proper function of the court below was not to second-guess the state court as to what substantive guarantees the Commonwealth's statutory and regulatory mosaic provided under the partic-

holtz *generality—like virtually all generalities—* *admits of some exceptions.*

ular circumstances, but, rather, simply to determine whether the respondent's application of its parole scheme, deemed lawful by the state's courts, violated the Due Process Clause. The district court set out to accomplish the former task instead of the latter. In so doing, it erred.

■ Here, a Massachusetts state court has already ruled that section 133A, as it read both in 1968 and 1983, conveyed no right to a fifteen-year hearing, and, moreover, that the respondent's aggregation of Hamm's sentences was a permissible policy notwithstanding any contrary signposts in the text of the state statute. *See Hamm II*, 564 N.E.2d at 1033–34. We believe that we are duty bound to follow this authoritative exposition of state law and, concomitantly, to reject the district court's impromptu interpretation of state law.[12] *See McGuire*, 502 U.S. at 67–68, 112 S.Ct. at 479–80; *Garner*, 368 U.S. at 166, 82 S.Ct. at 253.

We have considered and rejected the petitioner's argument that the state appellate court's decision is "so inconsistent with the statute's language and history that the state court decision itself [comprises] a wholly arbitrary and irrational action in violation of due process." *Ellard v. Alabama Bd. of Pardons and Paroles*, 824 F.2d 937, 944 n. 7 (11th Cir.1987) (citation and internal quotation marks omitted), *cert. denied*, 485 U.S. 981, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988). A federal court must not exercise the raw

power to strike down state laws in the name of the Constitution with too much gusto. Section 133A is silent on the parole eligibility of life prisoners facing from-and-after sentences; a Massachusetts court had never before ruled on the issue: and the appeals court based its holding on *Henschel*, which provided a defensible rationale for an aggregation policy.[13] Under these circumstances, it would be unprincipled to declare by federal fiat that the Due Process Clause broadly nullifies the Commonwealth's power to construe and apply its laws correctly. *See Lerner v. Gill*, 751 F.2d 450, 459 (1st Cir.), *cert. denied*, 472 U.S. 1010, 105 S.Ct. 2709, 86 L.Ed.2d 724 (1985).

The petitioner has also asserted that his fourteen years of state-induced reliance on a prospective 1983 parole hearing, followed by the state's abrupt shift in policy, deprived him of due process. In mounting this challenge, he embraces our decisions in *Lerner* and in *DeWitt v. Ventetoulo*, 6 F.3d 32 (1st Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1542, 128 L.Ed.2d 193 (1994). Hamm's ardor is mislaid. Those cases addressed the power of a state court retroactively to correct an erroneous sentence or a mistaken interpretation of state law. *See DeWitt*, 6 F.3d at 34–35; *Lerner*, 751 F.2d at 458–59. However, the calculation of the petitioner's original parole-eligibility date was not "incorrect," so he arguably possessed a greater interest in seeing it carried out than would a prisoner

12. We reach this conclusion cognizant that what we deem a controlling state court interpretation of state law emanated from an intermediate appellate court. Intermediate appellate court decisions "are trustworthy data for ascertaining state law," *Losacco v. F.D. Rich Constr. Co.*, 992 F.2d 382, 384 (1st Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 324, 126 L.Ed.2d 270 (1993), and, in the absence of other telltales indicating that the state's highest tribunal would have ruled otherwise, we believe it is prudent to accept the appeals court's interpretation as authoritative. *See, e.g., Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 177–78, 61 S.Ct. 176, 177–78, 85 L.Ed. 109 (1940) ("An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.").

The respondent's 1988 about-face and its return to a non-aggregation policy for life inmates

does not suggest a different outcome. Given the language of the statute and the discretion reposed in the Parole Board, it is entirely plausible that both the 1977 and 1988 policies are permissible interpretations of state law. *Cf. Strickland v. Commissioner, Me. Dept. of Human Servs.*, 48 F.3d 12, 17–18 (1st Cir.) (holding that an agency's rule may receive the usual degree of deference even when it represents a "sharp departure from a longstanding prior interpretation"), *cert. denied*, —— U.S. ——, 116 S.Ct. 145, 133 L.Ed.2d 91 (1995).

13. *Henschel* supports the view that, since parole decisions are premised on whether the Parole Board believes a convict can live outside prison without behaving in an antisocial manner, the Parole Board should not normally be required to make a series of decisions paroling a convict from one sentence to another. *See Henschel*, 330 N.E.2d at 484.

who was the beneficiary of a botched calculation. Nevertheless, the *Lerner/DeWitt* line of cases does not invalidate the Commonwealth's actions. We explain briefly.

Though we observed in *Lerner*, 751 F.2d at 458, that "unforeseeable changes ... made after the passage of a substantial period of time may, in some presumably extreme circumstances, be fundamentally unfair and hence violative of due process even if designed to correct an illegal sentence," this observation is inapposite here. In the first place, we do not think that the Massachusetts Appeals Court decision was unforeseeable; as stated above, the statute was silent on the precise situation, there was *no* decisional law directly on the point, and *Henschel* adumbrated the result reached in *Hamm II*. In the second place, a convict must show special prejudice stemming from a changed interpretation. *See DeWitt*, 6 F.3d at 35. This requisite showing must consist of something more tangible than merely demonstrating that "hopes were raised only to be dashed." *Lerner*, 751 F.2d at 459. Hamm has not suffered prejudice even remotely approaching that sustained by Lerner, whose parole-ineligibility period was extended from ten years to twenty years after he had (1) undergone two parole hearings, (2) moved into a minimum-security facility and accepted other privileges, and (3) transported his family to another state and caused them to invest in a business to create an employment opportunity for him, *see id.* at 453—to whom we denied relief under the Due Process Clause, *see id.* at 459.

In this case, all roads lead to Rome. We hold that the Commonwealth did not infract the petitioner's rights under the Due Process Clause when it failed to provide him a parole hearing in 1983. The administrative scheme in force at that time, approved as lawful by a state appellate court, did not mandate that petitioner receive a parole hearing after fifteen years. In ruling to the contrary, the district court erred.

## B. *The Ex Post Facto Claim.*

■ Article 1, § 10 of the Constitution ("No State shall ... pass any ... ex post facto Law") has been interpreted to forbid the enactment of

> any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed....

*Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925); *see also California Dept. of Corrections v. Morales*, —— U.S. ——, ——, 115 S.Ct. 1597, 1601, 131 L.Ed.2d 588 (1995) (stating that "the Clause is aimed at laws that retroactively alter the definition of crimes or increase the punishment for criminal acts") (citation and internal quotation marks omitted); *Collins v. Youngblood*, 497 U.S. 37, 42, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990) (quoting *Beazell*). Petitioner asseverates that, by depriving him of opportunities to obtain his release earlier than November of 2001, the 1977 aggregation policy made his punishment more burdensome and is, therefore, an impermissible ex post facto law. The Commonwealth demurs. In its view, the 1977 policy is not a "law" subject to the ex post facto proscription, and in all events, the resultant aggregation did not increase the petitioner's punishment. Because we agree with the Commonwealth's second contention, we need not decide the thorny question of whether the 1977 policy comprised a "law" subject to ex post facto analysis.[14]

---

**14.** We note in passing that, although the Supreme Court has not addressed the question of whether an administrative policy or regulation can be an ex post facto law, a number of courts have held that binding administrative regulations, as opposed to those that serve merely as guidelines for discretionary decisionmaking, are laws subject to ex post facto analysis. *See, e.g., Akins v. Snow*, 922 F.2d 1558, 1561 (11th Cir. 1991) (holding that Georgia parole board's new regulation promulgated pursuant to delegated legislative power that changed period between inmate's parole hearings from one year to eight years was a law subject to ex post facto analysis), *cert. denied*, 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1079 (1991); *Rodriguez v. United States Parole Comm'n*, 594 F.2d 170, 174 (7th Cir.1979) (deeming a new regulation that eliminated a parole hearing after one-third of a prisoner's sentence "tantamount to a statute" for ex post facto

In line with the foregoing, we assume for argument's sake, but do not decide, that the 1977 aggregation policy constituted a regulation possessing the full force and effect of law, and that it is therefore subject to analysis under the Ex Post Facto Clause. This assumption brings us to the decisive question: Does the 1977 policy, as applied to the petitioner, infringe the constitutional proscription against ex post facto laws?

It is a universal truth that, for a law to offend the Ex Post Facto Clause, it must be "more onerous than the prior law." *Dobbert v. Florida,* 432 U.S. 282, 294, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977). The prescribed inquiry demands that we compare the new law with the old in its totality to ascertain "if the new may be fairly characterized as more onerous." *Id.* The inquiry must be carried out in practical, as opposed to purely theoretical, terms; the ex post facto prohibition does not foreclose every change in the law that possesses some imaginable risk of adversely affecting an inmate's punishment. *See Morales,* —— U.S. at ——, 115 S.Ct. at 1602. In the last analysis, "the question of what legislative adjustments will be held to be of sufficient moment to transgress the constitutional prohibition must be a matter of degree." *Id.* at ——, 115 S.Ct. at 1603.

There is no mechanical formula for identifying which legislative changes have a sufficiently profound impact on substantive crimes or punishments to cross the constitutional line and which do not. Consequently, courts must determine, case by case, whether a particular change in the governing law "produces a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Id.* If so, the Ex Post Facto Clause comes into play. *See Hill v. Jackson,* 64 F.3d 163, 167–170 (4th Cir.1995).

*Morales* is the touchstone of modern ex post facto jurisprudence. There, the Justices examined a state statute that permitted parole boards to defer parole suitability hearings for up to three years for double murderers and certain other prisoners if the board specifically found that it was unreasonable to expect that parole would be granted during the intervening years. The Court concluded that the statute created "only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes," and held that these "conjectural effects" were insufficient to animate the Ex Post Facto Clause. *Morales,* —— U.S. at ——, 115 S.Ct. at 1603 (footnote and internal citations omitted).

Buttressing its conclusion, the Court identified several aspects of the statute that neutralized the risk of increasing the measure of punishment. First, the statute applied only to "a class of prisoners for whom the likelihood of release on parole is quite remote." *Id.* at ——, 115 S.Ct. at 1603. Second, the statute cabined the parole board's discretion by requiring it to make a specific finding that a particular prisoner was unlikely to be paroled. *See id.* Third, the statute only applied to those who were denied parole eligibility the first time around, thus restricting the affected class to those least likely to be found suitable for parole. *See id.* Finally, though the statute addressed the frequency of suitability hearings, it empowered the board to "tailor the frequency of subsequent suitability hearings to the particular circumstances of the individual prisoner." *Id.* The Court also noted that "the possibility of immediate release after a finding of suitability for parole is largely theoretical; in many cases, the prisoner's parole release date comes at least several years after a finding of suitability," and so "the practical effect of a hearing postponement is not significant." *Id.* (citation and internal quotation marks omitted).

purposes); *Love v. Fitzharris,* 460 F.2d 382, 385 (9th Cir.1972) (holding that a state's recalculation of a prisoner's parole-eligibility date under a new interpretation of the governing statutes violated the Ex Post Facto Clause because the state had changed its interpretation midstream), *vacated as moot,* 409 U.S. 1100, 93 S.Ct. 896, 34 L.Ed.2d 682 (1973). There are, of course,

cases—mostly involving the federal Parole Commission's guidelines—that can be read as holding the other way. *See, e.g., Kelly v. Southerland,* 967 F.2d 1531, 1532–33 (11th Cir.1992); *Inglese v. United States Parole Comm'n,* 768 F.2d 932, 936 (7th Cir.1985). We see nothing to be gained from entering this thicket without a compelling need to do so.

· At bottom, *Morales* is about the risk or likelihood of harm: the Court upheld the California statute largely because it found the risk of increased punishment posed by the new law to be speculative and, at any rate, to fall within acceptably small boundaries.[15] Viewed against this backdrop, Hamm's case founders. Though the parole scheme in effect in 1968 may have afforded him the possibility of terminating his incarceration as early as 1995 if a series of events materialized, it seems highly unlikely that these events would have come to pass. The likelihood of harm, therefore, is tiny. And, moreover, it is at least equally possible that, because of the structural differences imposed by the two policies, Hamm may well have languished in prison longer under the old scheme than under the new. On balance, then, it is virtually impossible to prognosticate the risk that the petitioner may be released at a later date because the 1977 policy rather than its predecessor, controls in his case.

Under the original policy, unless the petitioner managed to obtain parole in 1983 and thereafter amassed all possible credits, he would still have to be paroled a second time in order to be released as early as 1995, or, alternatively, to garner every conceivable credit in order to attain a wrap-up date in October of 2000. The record is bereft of any evidence suggesting that Hamm would probably achieve prompt parole into his from-and-after sentences, become a model prisoner, go on to earn all available credits, and then be paroled out of, or otherwise released from, his from-and-after sentences at any time before 2001.[16] In fine, this case, like *Morales*, involves a situation in which the possibility of harm is entirely speculative.[17]

This case also possesses a further dimension that weighs against the petitioner's position. Whereas the new law in *Morales* could not conceivably have inured to a prisoner's benefit, the new aggregation policy that the Commonwealth adopted in 1977 might very well redound to the petitioner's advantage. After all, the 1977 policy eliminates the need for two parole permits and ensures that petitioner will be eligible for parole from *all* his sentences at one fell swoop. Under the old policy, if the respondent denied the petitioner parole into his from-and-after sentences in 1983, 1986, and 1989—not an unlikely eventuality in light of Hamm's mottled record—his wrap-up date, even assuming the accrual of all conceivable credits, would not occur until sometime in 2006. This is a full five years *after* the date on which he could be paroled from all his sentences under the 1977 policy.

This scenario prompted the district court to conclude that "[i]n 1982, when the respondent recalculated the petitioner's parole eligibility, it was not clear whether the petitioner would be helped or harmed by aggregation;

---

**15.** The dissent strongly suggests that *Morales* stands for the bright-line proposition that any action which substantially delays, or deprives a prisoner of, an initial parole hearing works a *per se* violation of the Ex Post Facto Clause. The *Morales* Court rejected a similar argument, emphasizing that such an "arbitrary line has absolutely no basis in the Constitution. If a delay in parole hearings raises *ex post facto* concerns, it is because that delay effectively increases a prisoner's term of confinement, and not because the hearing itself has independent constitutional significance." *Morales*, at —— n. 4, 115 S.Ct. at 1603 n. 4. The dissent's mechanical approach not only ignores this admonition but also overlooks *Morales*'s central holding, namely, that a proper ex post facto inquiry must focus on the risk that the prisoner will be subject to an increased measure of punishment.

**16.** If past is prologue, *cf.* W. Shakespeare, *The Tempest*, act II, sc. i (1612), all of these prospects seem extremely dubious. Hamm's disciplinary record reveals a cavalcade of misconduct, including episodes of inciting a prison riot, arson, assaulting a guard, attempting an escape, conspiring to take a hostage, organizing a work stoppage, and possessing controlled substances. These are not the emblemata of an inmate who is likely either to inspire a parole board to act favorably on his behalf or to accumulate good-time credits at a rapid rate.

**17.** There are, of course, other similarities to *Morales*. We mention two of them. First, the challenged policy here—like the statute at issue in *Morales*, at ——, 115 S.Ct. at 1603—applies only to a limited class of prisoners (here, life inmates who face the overhanging prospect of from-and-after sentences) for whom the likelihood of release on parole is considerably below the norm. Second, the availability of special parole, *see supra* Part I(C)(3), offers the Parole Board the flexibility that the *Morales* Court deemed important. *See id.* at ——, 115 S.Ct. at 1604.

the balance sheet is unclear even today." *Hamm III*, slip op. at 10.[18] This statement is unarguably accurate, and the uncertainty that it portends strips the veneer of plausibility from the petitioner's ex post facto initiative. *Morales* makes it crystal clear that such uncertainty militates against the petitioner because any other approach would "effectively shift[ ] to the State the burden of persuasion as to [the prisoner's] ex post facto claim." *Id.* —— U.S. at —— n. 6, 115 S.Ct. at 1603 n. 6. A party who asserts an ex post facto claim must show a real possibility of cognizable harm, not a theoretical possibility bound up in gossamer strands of speculation and surmise.

We find illuminating a recent decision of another court that needed to construct the ex post facto balance of prospective benefits and burdens. In *United States v. McGee*, 60 F.3d 1266 (7th Cir.1995), the court addressed an amendment that became law following the defendant's conviction but before the imposition of sentence. The amendment eliminated a twelve-month minimum sentence for the offense of conviction and replaced it with a range of twenty-one to twenty-four months. The district court imposed the maximum twenty-four-month sentence. The defendant appealed, claiming that the amendment violated the ex post facto prohibition because it removed the possibility of a shorter sentence, i.e., a sentence of between twelve and twenty-one months. The Seventh Circuit disagreed. It noted that, although the amendment eliminated an opportunity for a milder sentence, it also placed a ceiling on the maximum available sentence, thus narrowing "the range of punishment to [the defendant's] benefit." *Id.* at 1271. This potential benefit made an evaluation of the risk that the new law might subject the prisoner to harsher punishment too speculative to constitute an ex post facto violation. *See id.*

The Seventh Circuit's rationale is persuasive here. Due to the peculiar concatenation of circumstances—especially the profound uncertainty over how the petitioner would have fared under the old system and the potential benefits that may accrue to him under the new regime—the potential risk of more Draconian punishment under the 1977 policy defies reliable measurement. As a result, we hold that the application of the new policy to the petitioner did not insult the Ex Post Facto Clause.

## III. CONCLUSION

We need go no further. For the foregoing reasons, we reverse the district court's order and dismiss the application for a writ of habeas corpus.

### *It is so ordered.*

STAHL, Circuit Judge (concurring in part and dissenting in part).

I agree that the Commonwealth did not violate Hamm's rights under the Due Process Clause when it failed to provide him a parole hearing in 1983. Unlike my colleagues, however, I am persuaded that, as applied to Hamm and other similarly-situated prisoners, the 1977 aggregation policy is an unconstitutional ex post facto law. First, I believe that the 1977 aggregation policy, which effectively altered the date of Hamm's initial parole hearing, is a "law" subject to ex post facto limitations. Second, contrary to my colleagues, I believe that the 1977 policy, as applied to Hamm and other similarly-situated prisoners, clearly produces a risk of increasing the measure of punishment sufficient to violate the Ex Post Facto Clause. Hence, I respectfully dissent from parts II. B.–III.

### I.

Article 1, § 10 of the Constitution clearly proscribes the authority of a state to enact

---

18. The *Morales* Court pointed out that the relevant inquiry must not focus "on whether a legislative change produces some ambiguous sort of 'disadvantage,' ... but on whether any such change ... increases the penalty by which a crime is punishable." *Morales*, —— U.S. at —— n. 3, 115 S.Ct. at 1602 n. 3. Despite the fact that the district court issued its opinion without the benefit of *Morales* and framed the corresponding part of its ruling as an inquiry into whether the 1977 policy resulted in a "[d]isadvantage to the petitioner," it nonetheless made a thoroughgoing examination of the uncertainty inherent in comparing potential results under the old and new policies.

any ex post facto law. As the majority explains, it is long settled that the Clause forbids

> any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed.

*Collins v. Youngblood,* 497 U.S. 37, 42, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990) (quoting *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925)); *see also California Dep't of Corrections v. Morales,* —— U.S. ——, ——, 115 S.Ct. 1597, 1601, 131 L.Ed.2d 588 (1995) ("the Clause is aimed at laws that retroactively alter the definition of crimes or increase the punishment for criminal acts") (internal quotation omitted). In general, an ex post facto inquiry requires a two-step analysis. *See Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987). A court should ask (1) whether the challenged provision is a "law" that acts retrospectively, and (2) whether the burden the law retrospectively imposes is of sufficient type and degree to violate the Constitution.

In this case, Hamm argues that the 1977 aggregation policy violated the Ex Post Facto Clause by retroactively depriving him of opportunities to obtain his release earlier than November 2001. In response, the Commonwealth contends that the 1977 aggregation policy was not a "law" subject to ex post facto limitation, and that, in any event, the aggregation did not increase Hamm's punishment. My colleagues agree with the second contention, and therefore find it unnecessary to consider the first. Because, as I explain more fully *infra* at 961–964, I believe that the 1977 aggregation policy engendered a sufficient risk of increasing Hamm's punishment, I cannot avoid the first prong of the Commonwealth's argument. Accordingly, I proceed first to explore fully whether the 1977 aggregation policy is a "law" subject to ex

post facto proscription, and, second, to discuss my disagreement with the majority over whether the new policy produces a risk of increasing the measure of punishment sufficient to violate the Constitution.[19]

## A. Is the 1977 Aggregation Policy a "Law"?

I agree with the district court that the 1977 aggregation policy was a "law" for purposes of ex post facto analysis. Although the aggregation policy was not formally promulgated as a regulation governing the Parole Board, it was as binding on the Parole Board, on a case-by-case basis, as an act passed by the legislature would have been. Moreover, the Commonwealth does not argue that, once the policy had been promulgated, the Parole Board had any discretion to deviate from the policy in any particular instance.

The Supreme Court has not addressed the question of whether an administrative policy or regulation can be an ex post facto law. A number of circuit courts, however, have held that binding administrative regulations, as opposed to those that serve merely as guidelines for discretionary decisionmaking, are laws subject to ex post facto limitation. For example, in a case factually similar to this one, the Ninth Circuit held that the California Department of Corrections's recalculation of a prisoner's parole-eligibility date under its new interpretation of the governing statutes violated the Ex Post Facto Clause because "the Department has changed its interpretation of the authority itself." *Love v. Fitzharris,* 460 F.2d 382, 385 (9th Cir.1972), *vacated as moot,* 409 U.S. 1100, 93 S.Ct. 896, 34 L.Ed.2d 682 (1973). The *Love* court stated that:

> the interpretation of the relationship between the statutes ... by the administrative agency charged with their enforcement has the force and effect of law. ... [N]ot only defendants, in contemplating their pleas, but also trial courts, in imposing sentences, are entitled to rely on such administrative interpretations. ... A new administrative interpretation which subjects the prisoner already sentenced to

---

**19.** I do not restate the facts or outline the prior proceedings. For a complete discussion of these

matters, see *Majority Opinion* at 949–953.

more severe punishment has the same effect as a new statute lengthening his present term....

*Id.* (citations omitted). The Eleventh Circuit similarly concluded that a regulation, promulgated pursuant to the Georgia parole board's delegated legislative power, that changed the period between inmate's parole hearings from one to eight years was a "law" subject to ex post facto limitation. *Akins v. Snow,* 922 F.2d 1558, 1561 (11th Cir.), *cert. denied,* 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1079 (1991); *see also Rodriguez v. United States Parole Comm'n,* 594 F.2d 170, 174 (7th Cir.1979) (new regulation eliminating parole hearing after one-third of sentence is "tantamount to a statute" for ex post facto purposes).

In those cases holding that particular administrative regulations or guidelines were *not* laws subject to the Ex Post Facto Clause, courts have often premised their holdings, at least in part, on the advisory nature of the regulation or guidelines in question. *See, e.g., Kelly v. Southerland,* 967 F.2d 1531, 1532–33 (11th Cir.1992) (rescission guidelines promulgated by federal Parole Commission did not violate Ex Post Facto Clause because they both were subject to amendment by the Commission and merely guided, but did not dictate, actual parole decisions); *Smith v. United States Parole Comm'n,* 875 F.2d 1361, 1367 (9th Cir.1988) (finding parole "regulation" was not an ex post facto law and noting that "the operative factor in assessing whether a directive constitutes a 'law' for ex post facto purposes is the discretion that the Parole Commission retains to modify that directive or to ignore it altogether as the circumstances may require"); *Inglese v. United States Parole Comm'n,* 768 F.2d 932, 936 (7th Cir.1985) ("The power to exercise discretion indicates that the [parole] guidelines are merely

guides, and not law: guides may be discarded when circumstances require; laws may not."). Moreover, these cases involve the federal Parole Commission's guidelines, which are "truly advisory" because the Commission possesses the authority to disregard them in the appropriate circumstances. *Bailey v. Gardebring,* 940 F.2d 1150, 1158 (8th Cir.1991) (Lay, C.J., dissenting), *cert. denied,* 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992). The Commonwealth makes no claim that its aggregation policy was merely "advisory" or that it was free to disregard the policy in a particular case.

The Commonwealth does postulate, however, that because it had discretion to adopt the 1977 aggregation policy in the first place and to modify the policy subsequently, as it did in 1988, the policy should not be considered a law. Although a number of the federal Parole Commission cases have relied in part on this reasoning,[20] *see, e.g., Smith,* 875 F.2d at 1367, I would reject it here. The argument not only exalts form over substance but its logic suggests that even legislative acts, because they too may be modified, should be immune to challenge under the Ex Post Facto Clause. *See Bailey,* 940 F.2d at 1158 (Lay, C.J., dissenting). A binding policy or regulation, promulgated pursuant to delegated legislative authority by an administrative body that implicitly retains authority to amend it in the future, is no different in its force and effect than a law passed by a legislature that retains authority to amend or revoke that law. The Commonwealth's Parole Board possessed delegated legislative authority to promulgate the aggregation policy: "The parole board shall ... make rules relative to the performance of its duties." Mass.Gen.L. ch. 27, § 5(e). Furthermore, under Massachusetts law, an agency regulation[21] "promulgated pursuant to a legislative

---

**20.** The Commonwealth claims that the Eighth Circuit adopted this reasoning in *Bailey,* which held that a change in Minnesota parole board regulations abolishing annual review of prospective release dates and limiting the board's discretion in changing such dates did not constitute a law for ex post facto purposes, even though the board lacked discretion to disregard its regulations in any given case. However, the relevant section of *Bailey,* 940 F.2d at 1156, drew the concurrence of a second panel member as to the

result only, and not its reasoning, *id.* at 1157 (Stuart, J., concurring).

**21.** That the 1977 policy was not formally deemed a "regulation" also does not seem to matter: Under Massachusetts law, a "regulation"
> includes the whole or any part of *every rule, regulation, standard or other requirement of general application and future effect* ... adopted by an agency to implement or interpret the law enforced or administered by it.

grant of power generally [has] the force of law." *Kenney v. Commissioner of Correction*, 393 Mass. 28, 468 N.E.2d 616, 619 (1984). Thus, because the 1977 aggregation policy was effectively a regulation having the full force and effect of law, I would hold that it is subject to limitation under the Ex Post Facto Clause.

### B. Does the 1977 Aggregation Policy Produce a Sufficient Risk of Increasing the Measure of Punishment?

I now turn to the issue at the heart of my disagreement with the majority: Whether, as applied to Hamm and other similarly-situated prisoners, the 1977 aggregation policy produces a risk of increased punishment sufficient to violate the Ex Post Facto Clause? My colleagues answer this question in the negative, basing their conclusion on two premises. First they deem it highly unlikely that, under the prior policy, Hamm would have won early parole from his life sentence and acquired the necessary good-time credits to advance the date of his ultimate parole hearing to a point earlier than 2001. Hence, they conclude that any harm to Hamm ensuing from the 1977 aggregation policy is highly speculative. Second, they posit that, due to structural differences between the two policies, a "real" benefit accrues to Hamm under the new policy. Then, combining these two premises, my colleagues ultimately conclude that, on balance, the 1977 aggregation policy does not violate the Ex Post Facto Clause. I strongly disagree.

My colleagues favorably compare the risk of increased punishment occasioned by the 1977 aggregation policy with the risk of increased punishment recently examined by the Supreme Court in *California Dep't of Corrections v. Morales*, —— U.S. ——, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). In *Morales*, the Court considered an amendment permitting the California state parole board to defer annual parole-suitability hearings for up to three years for prisoners at least twice convicted of murder. *Id.* at ——, 115 S.Ct. at 1600. In upholding the amendment, the Court rejected the contention that it violated the Ex Post Facto Clause simply because the

deferral of subsequent suitability hearings deprived affected prisoners of an opportunity to gain an earlier release from prison. *Id.* at —— n. 3, 115 S.Ct. at 1602 n. 3. The Court explained that just because the amendment caused the loss of some theoretical opportunity to gain an earlier release did not mean that it necessarily violates the Constitution. *Id.* Instead, the Court held that, for ex post facto purposes, the test is whether the loss of that opportunity actually produces a "sufficient risk of increasing the measure of punishment for the attached crimes." *Id.* at ——, 115 S.Ct. at 1603.

In applying this test, the Court focused on several factors that significantly minimized the California amendment's risk of harm. *Morales,* at —— – ——, 115 S.Ct. at 1603–05. First, the Court noted the amendment's limited application. *Id.* at ——, 115 S.Ct. at 1603. The amendment had no effect on any prisoner unless the California parole board first found that the prisoner was both unsuitable for parole and unlikely to be found suitable at subsequent hearings during the deferral period. *Id.* at ——, 115 S.Ct. at 1604. Moreover, the Court noted that the amendment did not affect "the date of any prisoner's initial parole suitability hearing: it affected the timing only of subsequent hearings." *Id.* at ——, 115 S.Ct. at 1605.

Next, the Court observed, *inter alia,* that, even with respect to a prisoner who might have actually received a favorable recommendation at an omitted hearing, the practical effect of the amendment on that prisoner's ultimate release date was only slight. *Morales,* at ——, 115 S.Ct. at 1605. At the deferred hearings, the parole board determined only a prisoner's "suitability" for parole but did not set actual parole dates. *Id.* The Court noted that, significantly, in many cases, an actual parole date comes several years after a finding of suitability. *Id.* Moreover, under California law, evidence that a prisoner in fact had been "suitable" for a year or two prior to the date of the prisoner's delayed hearing would be relevant in setting the prisoner's actual parole date. *Id.* Hence, the Court concluded that, in most

Mass.Gen.L. ch. 30A, § 1(5) (emphasis added).

cases, any delay resulting from the amendment could be corrected by the parole board when it set the prisoner's ultimate release date. *Id.*

In short, the Court recognized that the amendment's built-in limitations, severely restricting both its application and potential effect, effectively minimized any risk of increased punishment caused by the elimination of subsequent suitability hearings. Furthermore, the Court carefully limited the breadth of its holding, expressly disavowing any opinion "as to the constitutionality of any of a number of statutes that might alter the timing of parole hearings under circumstances different from those present here." *Morales,* at ——, n. 6, 115 S.Ct. at 1603 n. 6.

On close analysis, I believe the effect of the 1977 aggregation policy challenged here differs significantly from the risk of increased harm produced by the *Morales* amendment. First, in contrast to the *Morales* amendment, the adoption of the 1977 aggregation policy potentially affects all Massachusetts prisoners previously eligible for parole from a life sentence into consecutive from-and-after sentences. No provision in the policy limits the class of affected prisoners to only those adjudged by the Commonwealth's Parole Board (or some similar body) to be unlikely to win early parole or to earn significant good-time credits. Moreover, where the *Morales* amendment affected only subsequent hearings, the 1977 aggregation policy essentially delays an affected prisoner's initial parole hearing.

Second, also in contrast to *Morales,* the impact of the 1977 aggregation policy on those it affects is substantial. For example, under the prior policy, Hamm could have terminated his incarceration as early as 1995, through the acquisition of earned and statutory good-time credits and the application of his jail credits.[22] The 1977 aggregation policy extinguished that possibility; Hamm's term of incarceration cannot end under the 1977 policy before his first-available parole hearing in 2001. Thus, in contrast to the

amendment in *Morales,* which will have little, if any, real impact on an affected prisoner's actual time in prison, the 1977 aggregation policy could potentially increase Hamm's prison term by up to six years. *See Weaver v. Graham,* 450 U.S. 24, 26–27, 31–34, 101 S.Ct. 960, 962–63, 965–67, 67 L.Ed.2d 17 (1981) (holding that new state statute reducing amount of good time that could be earned prospectively by current inmates violates Ex Post Facto Clause because it removed existing opportunity for shortened prison time).

My colleagues gloss over these clear distinctions by positing that, whatever the risk might have been at the outset, given the brutal nature of Hamm's crime and his poor record as a prisoner, it is highly unlikely that Hamm could have availed himself of the opportunity to obtain an earlier release. Such analysis, however, is more akin to a harmless error inquiry focusing on the particulars of Hamm's case than to a proper ex post facto inquiry into whether the new law posed a sufficient risk of increasing the measure of punishment. Moreover, while it is clear that Hamm bears the ultimate burden of establishing that the new law changes the measure of punishment, *Morales,* —— U.S. at ——, n. 6, 115 S.Ct. at 1603 n. 6, this does not mean that he must necessarily show "that he would have been sentenced to a lesser term under the measure or range of punishments in place under the previous statutory scheme." *Id.* (citing *Lindsey v. Washington,* 301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937)); *see also id.* —— U.S. at ——, 115 S.Ct. at 1607 (Stevens, Souter, J.J., dissenting); *Miller v. Florida,* 482 U.S. 423, 432, 107 S.Ct. 2446, 2452, 96 L.Ed.2d 351 (1987) (reaffirming *Lindsey* ). Indeed, the proper "inquiry looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual." *Weaver,* 450 U.S. at 33, 101 S.Ct. at 966.

In any event, the fact of the matter is that the 1977 aggregation policy completely deprived Hamm of his once-existing opportuni-

---

**22.** As does the majority, I assume the accuracy of Hamm's claim of entitlement to 840 days of jail credit. *See Majority* at 952. I note, however, that the claim is not critical to my analysis.

Even without the 840 days, the 1977 aggregation policy deprives Hamm of the opportunity to advance his initial ultimate parole date by over three and half years.

ty to gain a release from prison as much as six years earlier than he can now. Moreover, notwithstanding my colleagues' *post hoc* evaluation of Hamm's chances, because Hamm never received a parole hearing, no findings exist to inform us whether or not the Commonwealth would have found Hamm to be a likely candidate for early parole from his life sentence. Indeed, without such findings or even knowledge concerning the standards and policies that guide the Commonwealth's Parole Board in making such recommendations, *this court* can only speculate as to whether the 1977 aggregation policy posed a sufficient risk to Hamm.[23]

In *Morales,* the Court reasoned that the delay in parole suitability hearings caused by the challenged amendment did not produce a sufficient risk of punishment because, in major part, the amendment affected only a carefully limited class of prisoners, and the impact of any delay on an affected prisoner's actual time in prison was negligible. Implicit in the Court's holding, however, is the recognition that delay in a parole hearing produces *some* possibility of an increase in punishment. Where, as here, the delay is not predicated on a finding that the prisoner is an unlikely candidate for parole, and the delay may significantly increase the prisoner's sentence, I believe, even in Hamm's case, such delay produces a "sufficient risk of increasing the measure of punishment." *Morales,* ——— U.S. at ———, 115 S.Ct. at 1603.

As noted, my colleagues also base their conclusion on the premise that the 1977 aggregation policy arguably provides a "real" benefit to Hamm and other affected prisoners. I believe, however, that it is this putative "benefit" that is too "speculative" to merit significant weight in the ex post facto inquiry. Any fair analysis reveals that the supposed benefit arising from the 1977 aggregation policy assumes several rather contradictory predicates. For example, to find that Hamm would benefit from the 1977 policy, I would need to assume both (1) that, under the prior policy, the Commonwealth's Parole Board would have refused to grant Hamm parole from his life sentence at least three times (in 1983, 1986, and 1989), or that, if the board did grant him such initial parole, he would have subsequently failed to accrue good-time credits, *and* (2) that, under the new policy, the Parole Board would then grant him "real" parole into society at large in 2001 (notwithstanding that the board would not even have granted Hamm parole from his life sentence into his lengthy from-and-after sentences on at least three prior occasions). In other words, the Parole Board would have to deny Hamm's request for parole from one lengthy sentence into another at least three times, but then, a short time later, be willing essentially to grant Hamm a complete release from prison. The inherent contradiction in such assumptions discloses the difficulty of quantifying such a "benefit," or even determining whether one genuinely exists. Thus, I believe that any benefit engendered by the 1977 aggregation policy is much too speculative to serve as an effective counterweight to its real risk of harm.[24]

## II.

In sum, I believe that the 1977 aggregation policy is a "law" subject to ex post facto

---

**23.** The fact that the record lacks the opinion, much less the findings, of the Commonwealth's Parole Board on Hamm's suitability for early parole clearly underscores the inappropriateness of my colleagues' "harmless error" style review.

**24.** My colleagues find further support in the Seventh Circuit's recent decision in *United States v. McGee,* 60 F.3d 1266, 1271 (7th Cir.1995). In *McGee,* the Seventh Circuit rejected an ex post facto challenge to a sentencing provision that substituted a mandatory range of 21 to 24 months in place of an open-ended 12 month minimum sentence for the offense of conviction. *Id.* I find the analogy inapt because in *McGee* the district court had actually sentenced the defendant to the maximum 24 months under the new sentencing range prior to the Seventh Circuit's review. Thus, the Seventh Court could fairly quantify both the benefit and the harm produced by the new sentencing range. Significantly, the fact that the district court had sentenced the defendant to the maximum possible under the new sentencing scheme clearly suggested that, if anything, it would have given the defendant a higher, not lesser, sentence under the old scheme. In our case, however, Hamm received no analogous treatment. He received no parole hearing. Thus, instead of fairly quantifying the risk as the *McGee* court did, we can only speculate as to the effect the 1977 aggregation policy will ultimately have on his sentence.

limitation, and that the policy produces a risk of increasing the measure of punishment sufficient to violate the Ex Post Facto Clause of the Constitution. Accordingly, I dissent from parts II.B.–III.