Dennis F. MONAHAN, Petitioner,

v.

David L. WINN, Respondent.

Manuel Sardinha, Petitioner,

v.

United States of America, Respondent.

United States of America,

v.

Gail Costello and Larry Silveira.

Julio A. Pereira, Petitioner,

v.

David L. Winn, Respondent.

No. CIV.03–40075–NG, CIV.03–10308–NG, CRIM.01–10385–NG, CIV.03–40139–NG.

United States District Court,
D. Massachusetts.

Aug. 12, 2003.

George B. Henderson, United States Attorney's Office, Boston, MA, for David I. Winn.

Dennis F. Monahan, Ayer, MA, Pro se.

Peter B. Krupp, Laurie and Krupp, LLP, Boston, MA, for Dennis F. Monahan, FMC Devens.

### MEMORANDUM RE: BUREAU OF PRISONS' NEW COMMUNITY CONFINEMENT POLICY

GERTNER, District Judge.

## I. INTRODUCTION

Just before Christmas 2002, after many judges and court personnel had left for the

holidays, the Bureau of Prisons ("BOP") faxed a letter to all federal judges. In the letter, the BOP announced that designations of offenders to community confinement were forbidden as a matter of law, notwithstanding the long-established BOP policy and practice of adopting judicial recommendations to place nonviolent inmates in such facilities to serve short terms of imprisonment. The BOP also announced its intention to abandon its practice of transferring offenders to community confinement for the last six months of their sentences; it would instead limit such transitions to ten percent of the total sentence, not to exceed six months.

The genesis of this legal epiphany was an opinion issued on December 13, 2002, by the Department of Justice Office of Legal Counsel to the United States Deputy Attorney General ("the DAG Opinion") that characterized BOP placement of prisoners into community confinement as "unlawful." A position that the DOJ had argued around the country in its role as an adversary in the criminal justice system was now foisted on the BOP as established doctrine, by virtue of the DOJ's role as counsel to the Bureau.

This literally overnight shift in BOP policy deprived judges of an important tool for sentencing a most "difficult" class of offenders: those on the borderline between probation and incarceration. More significant, the policy change, and the precipitous way it was imposed, wreaked havoc on defendants at various stages in their federal criminal cases. Offenders already in community confinement with more than 150 days remaining on their sentences were whisked away to secure BOP facilities. Recently-sentenced offenders who had been designated to surrender to community confinement facilities instead were required to report to secure facilities. Defendants who had pleaded guilty or had

been convicted, but had not yet been sentenced, found their expectations about the likely nature of their sentences radically upended. Offenders who had been promised transitional placements in community confinement six months prior to the conclusion of their sentences found their transition dates postponed.

Cases involving defendants in many of the above-described postures are currently pending before me, and I issue this Memorandum to address the issues common to all of them.

Numerous courts across the country have found the new BOP policy to be legally invalid on a variety of grounds. *See, e.g., Iacaboni v. United States,* 251 F.Supp.2d 1015 (D.Mass.2003) (Ponsor, J.); *Pearson v. United States,* 265 F.Supp.2d 973 (E.D.Wis.2003); *Tipton v. Federal Bureau of Prisons,* 262 F.Supp.2d 633 (D.Md. 2003); *Byrd v. Moore,* 252 F.Supp.2d 293 (W.D.N.C.2003); *United States v. Serpa,* 251 F.Supp.2d 988 (D.Mass.2003) (Young, C.J.); *Ferguson v. Ashcroft,* 248 F.Supp.2d 547 (M.D.La.2003); *Howard v. Ashcroft,* 248 F.Supp.2d 518 (M.D.La.2003); *Ashkenazi v. Attorney General,* 246 F.Supp.2d 1 (D.D.C.2003); *United States v. Tkabladze,* Nos. CV 03–01152, CR 02–00434(A) (C.D.Cal. May 16, 2003) (slip op.); *Mallory v. United States,* 2003 WL 1563764 (D.Mass. Mar.25, 2003) (Woodlock, J.); *United States v. West,* 2003 WL 1119990 (E.D.Mich. Feb.20, 2003); *McDonald v. Federal Bureau of Prisons,* No. 03–CV–235 (N.D.Ga. Feb. 14, 2003); *United States v. Canavan,* 2003 WL 245226 (D.Minn. Jan.22, 2003).

I agree with the weight of this authority. Judge Ponsor's scholarly opinion in *Iacaboni* is particularly thorough and compelling, and I concur in the three key elements of his analysis. First, "the well-established practice of the BOP" of placing certain offenders in community confine-

ment to serve some or all of their terms of imprisonment "was not and is not, even remotely 'unlawful.'" *Iacaboni,* 251 F.Supp.2d at 1017–18. Second, "the BOP's manner of adopting this fundamental change, even assuming it had substantive merit, was improper" under the Administrative Procedure Act. *Id.* at 1018. Third, the retroactive application of this policy violates the Constitution. *See id.* Offender classification and assignment decisions made pursuant to this policy are therefore invalid, and the BOP retains the discretion to employ community confinement as it always did prior to December of 2002.

While there is no need for me to "reinvent the wheel" with this opinion, I will address new arguments that the government has advanced in defense of the BOP policy as its position and reasoning continue to evolve in response to *Iacaboni* and other cases.

## II. *CASES PENDING BEFORE THE COURT*

The above-captioned cases, which involve offenders at various stages of criminal process, all implicate the BOP's new community confinement policy. I briefly summarize the posture of each case here in order to lend context to the broader discussion. Individual orders consistent with this opinion will issue (or have been issued) separately in each of the cases. To the extent that a case raises other matters, as in *United States v. Silveira,* separate

opinions will issue on those matters, incorporating this memorandum by reference.

In general, the cases before me presently fit into three categories: The first category includes individuals who pleaded guilty or were convicted prior to the new BOP Policy, were sentenced and still awaiting surrender to community confinement facilities, pursuant to sentencing judge recommendations that the BOP had accepted (Dennis Monahan, Manuel Sardinha); the second includes individuals who pleaded guilty or were convicted prior to the new Policy, but were sentenced afterward (Gail Costello, Larry Silveira); and the third is comprised of individuals approaching the end of their imprisonment terms who had been designated for a community confinement facility, pursuant to longstanding BOP policy, only to have their designations abruptly changed (Julio Pereira).

### A. *Individuals Who Pleaded Guilty or Were Convicted Before the New Policy, Who Had Yet to Surrender to a Community Confinement Facility, Pursuant to Judicial Recommendations Adopted by BOP*

#### 1. *Dennis Monahan*

Dennis Monahan was sentenced in late 2002 in two cases, one in the District of New Hampshire for bankruptcy fraud (18 U.S.C. § 152), and one in the District of Massachusetts for forging the signature of a court officer (18 U.S.C. § 505). He was sentenced in the New Hampshire case to imprisonment for one year and one day[1]

---

1. Monahan's lawyer at the time, who was subsequently suspended from the practice of law for neglect of cases and misrepresentations to clients, failed to seek a downward departure on any basis, even though Monahan's family circumstances clearly warranted consideration. Monahan lived with his wife of 18 years, Carrie, and his three adopted children. Carrie suffers from both an epilep-

tic seizure disorder and systemic lupus, both of which have at times become acute and incapacitating. All three of Monahan's children were adopted from Korea and suffer from severe psychological disorders. Monahan's presence or proximity to his home is crucial to assist with his wife's care, and to permit him to work and provide health insurance. He also has played a critical and in-

and sentenced in the Massachusetts case to imprisonment for 30 days, to be served concurrently with the New Hampshire sentence. Significantly, after careful consideration, judges of both courts recommended placement in community confinement.

In accordance with these recommendations, in early December 2002, Monahan and his counsel were notified that the BOP had designated Monahan to serve his sentence at Coolidge House. Then came the Christmas Eve missive, the new BOP Policy, and an order to Mr. Monahan that he report to FMC–Devens. In a turn of events that reflected the chaos following the BOP's precipitous policy change, Monahan, with a criminal history of I, was held in solitary confinement and lockdown for 38 days due to overcrowding (apparently attributable at least in part to the new BOP Policy).

■ On or around March 26, 2002, Monahan filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging the new BOP Policy and his designation to FMC–Devens. Apparently, due to some confusion concerning receipt of the $5 filing fee, the file languished in the clerk's office for several months before reaching the Court.[2] On June 20, 2003, I issued a Temporary Restraining Order ("TRO") requiring the BOP to re-designate Mr. Monahan under its pre-December 2002 criteria. Shortly thereafter, Monahan was redesignated to Coolidge House. The TRO was extended by consent of the parties. On July 30, 2003, I entered a Preliminary Injunction on terms identical to those in the TRO. This memorandum comprises the findings of fact and conclusions of law on which that preliminary injunction was based.

### 2. *Manuel Sardinha*

On October 30, 2002, Manuel Sardinha was sentenced to ten months imprisonment for three counts of filing false income tax returns (26 U.S.C. § 7206(1)) with a community confinement recommendation. In December of 2002, Sardinha learned that he had been designated by the BOP to self-surrender at Coolidge House. On December 30, 2002, Sardinha's counsel learned, to his surprise, that Sardinha had been redesignated to FMC–Devens pursuant to the new BOP policy.

On or around February 19, 2003,[3] Sardinha filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 in which he challenged the BOP policy. While it is not entirely clear whether this action is more properly brought under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, the government apparently does not dispute that the court can engage the merits of the community confinement issues under at least one of those two statutes. *Cf. Iacaboni*, 251 F.Supp.2d at

---

deed, irreplaceable role in the care and psychological well-being of his children.

**2.** While not uncommon in *pro se* cases, this sort of delay is disturbing and completely unnecessary because the filing fee requirement is not jurisdictional. *See Casanova v. Dubois*, 304 F.3d 75, 80 (1st Cir.2002). The senselessness of the delay is compounded in Monahan's case by several additional circumstances. Monahan expressly indicated in the cover letter accompanying his petition that he had requested prison authorities to cut a $5

check from his account to be sent separately—his only means of submitting the filing fee—and he even attached a copy of the official receipt for his request to the cover letter.

**3.** Counsel immediately brought the sudden change in Mr. Sardinha's place of surrender to the Court's attention. I ordered Mr. Sardinha's surrender date to be extended pending briefing on the issue. While awaiting surrender, pursuant to the extended deadline, Mr. Sardinha filed a § 2255 petition.

1017 n. 1 (adjudicating the § 2255 claim of one of three petitioners, Mark Pandolfi, who had not yet surrendered to BOP custody, and noting that the court could instead invoke remedial powers under § 2241 if necessary); *see also Chambers v. United States*, 106 F.3d 472, 474 (2d Cir. 1997) ("It is routine for courts to construe prisoner petitions without regard to labeling in determining what, if any, relief the particular petitioner is entitled to.").

I postponed Mr. Sardinha's surrender date during the pendency of this action. Based on my findings in this Memorandum, I intend to issue a preliminary injunction requiring the BOP to designate Sardinha's place of incarceration under its pre-December 2002 criteria.

### B. *Individuals Who Pleaded Guilty or Were Convicted Prior to the New BOP Policy, and Were Sentenced After the Change*

#### 1. *Gail Costello*

Gail Costello pled guilty to one count of structuring (31 U.S.C. § 5324(3)) on November 12, 2002, prior to the change in BOP policy. Her sentencing hearing was held over two days, the final day being June 2, 2003. Her total offense level was 11 in criminal history category I. This yielded a Guideline range of 8 to 14 months' imprisonment, in Zone C of the Guidelines table.

Prior to the policy change in December 2002, the Bureau of Prisons typically would have honored judicial recommendations of community confinement for Zone C offenders. Because of the change in the BOP position, which I believed unlawful, and because it was inconceivable that this policy change had ever been envisioned by the Sentencing Commission,[4] I departed

from the Guidelines. The goal of my sentence was to achieve the same outcome that would have been available in Costello's case prior to the BOP's improper policy change. I departed downward one level into Zone B, pursuant to U.S.S.G. § 5K2.0, and imposed a term of probation that included community confinement.

The Sentencing Commission obviously could neither have anticipated nor taken into consideration the sudden, radical, change in BOP policy that eliminated community confinement as an incarceration option for Zone C offenders. Indeed, as Judge Ponsor noted in *Iacaboni*, 251 F.Supp.2d at 1017, judicial recommendations of community confinement for Zone C offenders had been regularly adopted throughout the past fifteen years of Guideline sentencing.

#### 2. *Larry Silveira*

Larry Silveira was convicted of one count of perjury on December 4, 2002. I sentenced him on June 2, 2003. His base offense level was 14 in criminal history category I, which ordinarily would yield a sentence of 15 to 21 months' incarceration. I departed downward to level 10 (Zone B) and imposed probation including community confinement for two reasons. First, pursuant to U.S.S.G. § 5K2.0 I determined that the nature of Silveira's offense conduct is well outside the "heartland" of perjury cases. Second, also pursuant to § 5K2.0, I departed downward to probation, allowing me to impose community confinement, for the same reasons as I had for Costello. The Sentencing Commission could not have anticipated that community confinement would no longer be available to Zone C offenders. I will elaborate the first ground for departure (the heartland

---

4. In addition, the individual sentencings did not furnish the Court with an occasion to invalidate the policy, as would a habeas petition brought under § 2241.

issue) at greater length in a separate sentencing memorandum that will issue forthwith.

### C. *Individuals Approaching the End of Their Imprisonment Terms Who Had Been Designated for Community Confinement Pursuant to Longstanding Policy Only to Have Their Designations Abruptly Changed (Julio Pereira)*

Julio Pereira is serving a sentence of 18 months at FMC–Devens for conviction on four counts of subscribing false tax returns (26 U.S.C. § 7206(1)) and twenty-one counts of using the mails for commercial bribery (18 U.S.C. § 1952). Prior to December of 2002, Pereira alleges that he was led to believe that he would transition to a halfway house for the last six months of his sentence, on or around July 7, 2003. The government counters that there was no support in Pereira's file for an assertion that he ever had an expectation that a transition to community confinement would come this early.[5] In any event, Pereira ultimately was officially informed that he would not be transferred to community confinement until November 25, 2003, when just ten percent of his sentence remained. What is not clear on this record is whether that outcome would have been any different under the pre-December 2002 BOP policy.

On or around June 25, 2003, Pereira filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging the new BOP policy. I treated his petition as a motion for TRO/Preliminary Injunction and held a hearing on August 5, 2003.

I find that Pereira has shown a likelihood of success on the merits of the legal question at issue. I agree that the BOP's revised view, pursuant to the DAG Opinion, that it lacks discretion to transfer offenders to community confinement for a full six months (or, for that matter, at any time) at the end of their sentences is incorrect.

Less clear is whether Pereira has suffered the requisite "irreparable harm" to warrant the issuance of an injunction, because the parties dispute whether, under the old BOP policy, Pereira would have been placed in community confinement any earlier than is now scheduled. I therefore decline to enter a TRO and will defer decision on a possible preliminary injunction. Meanwhile, I will appoint counsel for Pereira to assist in developing the record.

---

**5.** Pereira's situation thus differs from that in another case recently before me, *Gammon v. Winn*, No. 03–40127–NG, where it was clear that application of the new BOP policy had delayed the petitioner's entry into community confinement.

Frank Gammon is serving a sentence of 27 months' imprisonment at FMC–Devens for two counts of interstate transportation of stolen vehicles (18 U.S.C. § 2312). Gammon's statutory release date, assuming good behavior, is October 24, 2003. Prior to December 2002, Gammon was informed·by the BOP that he would transition to community confinement on April 28, 2003, approximately 6 months prior to his release date. Based on the new BOP policy, however, Gammon was informed that he would move to community confinement for only the last 10 percent of his sentence, on August 15, 2003. The government expressly stated in a letter to Gammon that the reason for the setback was the new BOP Policy.

On or around May 13, 2003, Gammon brought a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2241, challenging the BOP policy and seeking a preliminary injunction ordering him to community confinement. The case came to the Court's attention on or around June 20, 2003, and a preliminary injunction hearing was scheduled for July 23, 2003. At the hearing, the petitioner elected to withdraw the action because his delayed transfer to community confinement under the new policy was already imminent—set for August 15, 2003.

## III. EXHAUSTION

■ In the *Monahan* case, the government urged dismissal for failure to fulfill the exhaustion requirement of the Prison Litigation Reform Act ("PLRA"):

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).[6] This PLRA exhaustion requirement has no "futility" exception. *Booth v. Churner*, 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.").

■ However, the government has cited no authority to suggest that this requirement governs habeas petitions. The government quoted another section of the PLRA that defines prison conditions as "the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison," while leaving out the continuation of that sentence: *"but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison."* 18 U.S.C. § 3626(g)(2).

■ The cases before me do not challenge "prison conditions" as that is commonly understood under § 1983. Rather, they challenge the BOP's rule revision that deprives it of legal discretion to designate certain offenders to community confinement facilities when performing its statutory duty to execute criminal sentences.[7] It is well established that challenges to the "manner, location, or conditions of a sentence's execution" are proper subjects of a habeas corpus action under § 2241. *Gonzalez v. United States*, 150 F.Supp.2d 236, 240 (D.Mass.2001) (citing *Hernandez v. Campbell*, 204 F.3d 861, 864 (9th Cir. 2000)). And as such, the statutory PLRA exhaustion requirement does not apply. *See Davis v. Fechtel*, 150 F.3d 486, 490 (5th Cir.1998) ("The PLRA thus does not apply to section 2241 proceedings."); *West*, 2003 WL 1119990, at *2 ("[T]he explicit exhaustion requirements which are contained in … the … AEDPA … and the … PLRA do not apply to habeas petitions filed under 28 U.S.C. § 2241.").[8]

6. The government's PLRA exhaustion defense obviously would not apply to Sardinha, who is not ·yet "confined," nor to Silveira and Costello, who have not brought separate actions challenging the BOP policy. The government did not raise an exhaustion defense with respect to Gammon, presumably because he did seek an administrative remedy by writing a letter to Larry D. Thompson of the Department of Justice reciting objections to the BOP policy, which was then answered by the respondent, Warden David Winn. Exhaustion would, however, be a potential issue in Pereira's case, although the government did not raise the issue in its papers in that case.

7. In contrast, civil rights actions under § 1983 alleging some constitutional deprivation in connection with an individual security classification within a prison facility, for example, might arguably be covered by the PLRA exhaustion requirement.

8. Even if exhaustion were required in these cases (and it is not), the petitioners could undertake to exhaust administrative remedies right now, while their cases are pending before me. Exhaustion is a waivable affirmative defense, not a jurisdictional requirement. *See Casanova v. Dubois*, 304 F.3d 75, 78 n. 3 (1st Cir.2002) (adopting the position of a majority of circuits that the PLRA exhaustion requirement is a non-jurisdictional affirmative defense). I would be inclined to leave in place the preliminary injunctive relief that I have granted while exhaustion is under way in order to prevent irreparable harm to the petitioner. *See Jackson v. District of Columbia*, 254 F.3d 262, 268 (D.C.Cir.2001) ("[T]he PLRA contains nothing expressly foreclosing

■ Apart from the PLRA, the Court will not impose a providential exhaustion requirement because pursuit of administrative remedies in these cases, where the BOP has announced a clear and inflexible policy, clearly would be futile. *See Iacaboni,* 251 F.Supp.2d at 1017 n. 1.

## IV. MERITS OF THE NEW BOP POLICY

### A. Statutory Law and the Sentencing Guidelines

■ There can be no question that the BOP's longstanding practice of designating certain offenders to serve all or part of a term of imprisonment in community confinement was legal and even wise. While I will not retrace the historical steps meticulously detailed in other opinions, it is worth emphasizing that the use of community confinement designations "goes back continuously for almost forty years." *Tkabladze,* slip op. at 5. All of the institutional parties concerned with criminal sentencing—Congress, the Department of Justice, the BOP, and the Sentencing Commission—recognized the propriety of this practice and actively promoted community confinement as a sentencing option to judges. *See Iacaboni,* 251 F.Supp.2d at

courts from exercising their traditional equitable power to issue injunctions to prevent irreparable injury pending exhaustion of administrative remedies .... [T]he court ha[s] inherent power to protect the prisoners while they exhaust[ ] administrative remedies."). In an abundance of caution, Monahan and Pereira would be well-advised to go through the exercise of administrative exhaustion, however futile it is likely to be.

9. There is a certain disingenuousness about the "occasion" for this revisitation of policy. The DAG Opinion is written as if in response to a BOP consultation about an unanswered question regarding its authority, *see* DAG Opinion at 1 ("Your office has asked us to advise you ...."), when in fact the issue was well-settled in a BOP Program Statement and

1021–22. Nothing in the government's arguments here convinces me that I should view this accumulated weight of policy and practice as some kind of aberration or illegal mistake.

The government bases the sudden change [9] reflected in the DAG Opinion and new BOP policy on its reinterpretation of the statute that empowers the BOP in its custody of federal prisoners, 18 U.S.C. § 3621(b), and on the Sentencing Guidelines referred to therein. The arguments ring hollow.

### 1. The Language of § 3621

18 U.S.C. § 3621(b) does not support the government's position at all. It pertains generally to the BOP's discretion over "place of imprisonment" and provides, in pertinent part:

The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise ... that the Bureau determines to be appropriate and suitable, considering—

manual. *See Pearson* 265 F.Supp.2d at 975 (citing U.S. Department of Justice, Federal Bureau of Prisons, *Judicial Resource Guide to the Federal Bureau of Prisons* 15–16 (2000) ("The Bureau may designate an offender directly to a community based facility to serve his or her sentence, but ordinarily this is done only with the concurrence of the sentencing court.")), and PS 7310.04, *Community Corrections Center (CCC) Utilization and Transfer Procedure* ¶ 5 (Dec. 16, 1998) ("[T]he Bureau is not restricted ... in designating a CCC or an inmate and may place an inmate in a CCC for more than the 'last ten percentum of the term,' or more than six months, if appropriate."); *Howard,* 248 F.Supp.2d at 530–31 (same).

(1) the resources of the facility contemplated;

(2) the nature and circumstances of the offense;

(3) the history and characteristics of the prisoner;

(4) any statement by the court that imposed the sentence—

(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

(B) recommending a type of penal or correctional facility as appropriate; and

(5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

The BOP takes the position that the discretion § 3621(b) affords the BOP in determining "place of imprisonment" does not include the discretion to transfer a prisoner to community confinement facilities—neither pursuant to a judicial recommendation at sentencing, nor at the end of a prisoner's term. Prison, it appears, necessarily means a very specific place—with barbed wire and absolute constraints on liberty—and nothing else. This definition admits of only one exception, which the government itself cites, contradicting itself: During the final 10 percent of the term, not to exceed six months, under 18 U.S.C. § 3624(c) (the statute outlining the steps that the BOP is required to take at the end of a prison term to transition the prisoner back into society), prison can mean community confinement, or even home detention.

No such limitation on BOP's discretion is apparent on the face of § 3621(b). The statute prescribes that the facility be "penal or correctional" and that it meet minimum habitability standards. Community confinement centers—and Coolidge House,

specifically—have historically been viewed to satisfy the statutory conditions. *Iacaboni*, 251 F.Supp.2d at 1024–25. Simply stated, "[c]ommunity confinement constitutes one form of 'imprisonment,' and a community confinement facility is a 'penal or correction facility.'" *Id.* at 1025.

In fact, it is § 3621(a) that arguably provides the closest thing to a definition of "imprisonment" as one can find in the United States Code:

A person who has been sentenced to a term of imprisonment ... *shall be committed to the custody of the Bureau of Prisons* until the expiration of the term imposed, or until earlier released for satisfactory behavior pursuant to the provisions of section 3624.

18 U.S.C. § 3621(a) (emphasis added). The statute makes clear that it is not *place*, but *custody*, that defines imprisonment—a conceptual distinction that is consistent with long-accepted views on this subject. *See Reno v. Koray*, 515 U.S. 50, 63–65, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (recognizing that time spent in community confinement subject to BOP custody entitles a prisoner to sentencing credit, while community confinement on pretrial release does not, because "[u]nlike defendants 'released' on bail, defendants who are 'detained' or sentenced' *always remain subject to the control of the Bureau*") (emphasis in original).

The district court in *Byrd* made clear that there is ample room within the broad parameters of § 3621(b) to accommodate community confinement:

This statute is extremely broad; it rules out almost no imaginable facility or institution, public or privately owned....

[P]eople do not become inmates of CCCs because they want to. While they are able to leave under some limited circumstances as outlined by 18 U.S.C. § 3622, they are not free to come and go as they

please. They are "imprisoned." Their liberty is restricted. There are consequences for their failure to follow rules. The Court is not satisfied that the term "imprisonment" requires that all those in the custody of the BoP must be confined in structures resembling Alcatraz or Sing Sing. Section 3621 certainly does not impose such a limitation on the BoP's discretion.

252 F.Supp.2d at 301. The *Byrd* court could not be clearer, more cogent, or in the right on this question.

Notwithstanding the clarity of § 3621, the government looks beyond the language of the statute, to the Sentencing Guidelines, and to a swath of legislative history, wholly removed from its context, which pertains not to § 3621(b) but to a proposed amendment to a different section 18 U.S.C. § 3624(c). None of these materials can plausibly be read to supply the meaning that the DOJ, first through adversary proceedings in criminal prosecutions, and now more opportunistically as counsel for the BOP, proposes for § 3621(b).

### 2. *The Sentencing Guidelines*

■ Any argument that relies on the Sentencing Guidelines to cabin the BOP's discretion in place of confinement is flawed from the outset. First, the authoritative statement of the BOP's ability to locate prisoners in all settings is enshrined in a *statute,* § 3621(b). If, as the government contends, that statute conflicts with two specific sections of the Sentencing Guidelines, the *Guidelines* would have to yield. As Judge Ponsor observed in *Iacaboni,* "statutes trump guidelines, not vice versa." *Iacaboni,* 251 F.Supp.2d at 1024 (citing the Supreme Court's "emphatic" holding in *United States v. LaBonte,* 520 U.S. 751, 757, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997), that notwithstanding the considerable authority given to the Sentencing Com-

mission, "it must bow to the specific directives of Congress"); *see also Pearson,* 265 F.Supp.2d at 982 ("The BOP's authority to place prisoners is set forth by Congress in 18 U.S.C. § 3621(b), not by the Sentencing Commission in the guidelines." (footnote omitted)).

■ Second, the Sentencing Guidelines are binding only on the courts; they have nothing to say about the BOP's use of its agency discretion as custodian of federal prisoners. *Iacaboni,* 251 F.Supp.2d at 1034. In fact, as Judge Ponsor noted, § 3621(b) gives an itemized list of factors the BOP is to consider in determining an appropriate place of confinement. One of these is "any statement by the court that imposed the sentence recommending a type of penal or correctional facility as appropriate," 18 U.S.C. § 3621(b)(4)(B). At the end of the list of issues that the BOP is to *consider* are policy statements of the Sentencing Commission, *id.* § 3621(b)(5). Even assuming that the Commission ever addressed issues concerning the place of confinement—which it plainly never did—it is disingenuous to suggest that the BOP's old policy violated a "policy statement" it was charged with "considering." The Guidelines do not purport to govern place of confinement—they never did and never will. They are about judicial sentencing.

Assuming *arguendo* that the Sentencing Guidelines did speak the law on the subject of BOP's discretion to put prisoners in community confinement, it is by no means clear that they would say anything inconsistent with the BOP's longstanding reading of § 3621. The government's Guidelines argument suggests that the conditions outlined by the Sentencing Commission for "Zone C" and "Zone D" offenders recognize a difference between imprisonment and community confinement. Specifically, the Guidelines provide

that Zone D offenders are to complete a "sentence of imprisonment," U.S.S.G. § 5C1.1(d), whereas Zone C offenders are to serve either a "sentence of imprisonment" or a "sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention ... provided that at least one-half of the minimum term is satisfied by imprisonment," *id.* § 5C1.1(d)(2).

It does not obviously follow, as the government contends, that community confinement is only appropriate for the "term of supervised release," described in U.S.S.G. § 5.C1.1(d)(2), and not for "imprisonment." Reading the Guideline in tandem with § 3621, "imprisonment" refers to the custody of the Bureau of Prisons. The section mandates that one half of a Zone C term be served in BOP custody, during which time, under § 3621, the BOP may place an offender in a community confinement facility. The Guideline does not place imprisonment and community confinement in opposition; it places in opposition BOP custody and supervised release under the auspices of probation.

While an inmate may serve his or her time in community confinement either as part of BOP custody or as a condition of supervised release, there are important differences. Far from nullifying § 5.C1.1(d)(2)'s "provided that at least one-half of the minimum term is satisfied by imprisonment" language, a Zone C term spent entirely in community confinement, as in Coolidge House, differs considerably from supervised release there. During the "imprisonment" component of his term, the offender, officially within the custody of the BOP, 18 U.S.C. § 3621(a), is answerable to the Bureau for his conduct. The BOP can, in its discretion, withdraw him from Coolidge House and transfer him to a higher-security facility. During supervised release, in contrast, an offender who violates the conditions of his release must appear before the Court in a revocation hearing; the outcome of that hearing—continuation of supervised release, or transfer to the custody of BOP, for example—is by no means certain.

Finally, as the *Iacaboni* court observed, other *statutes*—not Guidelines—contemplate resort to community confinement *as a form of imprisonment. Iacaboni*, 251 F.Supp.2d at 1029 (citing 18 U.S.C § 3622(b) (allowing imprisoned inmates to "participate in a training or educational program in the community"); 3622(c) (authorizing imprisoned inmates to "work at paid employment in the community while continuing in official detention at the penal or correctional facility")).

The *Iacaboni* decision more than adequately dispatches the case law that the government marshals in support of its contrary view. *See id.* at 1030–33 ("Decisional Law Is Not Uniform"). I therefore adopt Judge Ponsor's detailed and itemized review of the cases without elaboration.

### 3. *18 U.S.C. § 3624(c)*

Another statute, 18 U.S.C. § 3624(c), outlines what steps the BOP is required to take at the end of an imprisonment term to ease a prisoner back into society—and when it must take them. Section 3624(c) provides as follows:

> The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this

subsection may be used to place a prisoner in home confinement.

18 U.S.C. § 3624(c).

This section bolsters the view that imprisonment means being in the custody of the BOP, rather than in any specific locale. It includes home confinement—a condition substantially less coercive than even community confinement—among the array of measures that the BOP may take in discharging its duty to help transition prisoners back into society at the end of their terms. *Id.* Indeed, in a number of cases brought before this very Court since the BOP changed its policy in December (including Mr. Pereira's), the government has affirmed that community confinement facilities are appropriate places in which prisoners may spend the final 10 percent of their terms. The position the government has conceded in these cases—that community confinement is "imprisonment" during the last 10 percent of a sentence—is fundamentally at odds with its view on what constitutes imprisonment during the first 90 percent.

Notwithstanding the plain language of § 3624(c) and the BOP's own ongoing interpretation of that statute, the government remains convinced that § 3621(b) gives the BOP no discretion to install its prisoners in community confinement facilities. In support of this position, the DOJ has excavated a *post hoc* blip from § 3624(c)'s legislative history that allegedly turns all of the preceding law and logic on its head. Section 3624(c) was enacted in 1984, Pub.L. No. 98–473, § 212(a)(2), 98 Stat. 1837, 2008, and amended a number of times thereafter.

In 1990, when Congress considered amendments to the provision, a House Report interpreted the existing statute in its description of those amendments:

> Sections 1403 and 1404 [of the proposed bill] address the Federal Bureau of Prisons' authority to place inmates in community corrections programs and home confinement. Currently, [under § 3624(c)] the Bureau of Prisons can only place an inmate in a Community Correction Center for up to six months or for the last 10 percent of his or her sentence, whichever is shorter. Section 1403 would authorize the Bureau of prisons to place certain non-violent offenders in community facilities for longer time periods at the end of their sentences so that they can better readjust to society. Section 1404 restores the Bureau of Prisons' previously existing authority to designate an appropriate place for offenders to serve their sentences, including Community Correction Centers or home confinement.

H. Rep. No. 101–681(I), at 140, U.S.Code Cong. & Admin.News 1990, at 6472, 6546.

 The bill before the House at the time would have eliminated these time restrictions. Dissenting representatives, committed to preserving the time restrictions on pre-release reference to community confinement, proposed a compromise amendment.[10] The time restrictions would

---

10. The government also relies on the language of a particular representative during floor debate, who observed of the proposed bill:

> My amendment would give them that opportunity to allow some home confinement with or without monitoring by telephonic or electronic signaling devices. The reason I am offering this amendment is because in the language of the bill as it is now out here before us, there has been a concern I have had for some time that we are giving a whole lot more authority to the Bureau of Prisons than we really ought to .... The language in the bill, without being amended, would have effectively allowed the Director and the Bureau of Prisons to release any prisoner for any length of time under

remain, but the statute would expressly allow the BOP to consider the possibility of home detention during the 10 percent/six month period. 136 Cong. Rec. 27,587–88 (1990). The compromise amendment passed, and the bill was ultimately enacted to add only the following sentence to § 3624(c): "The authority provided by this subsection may be used to place a prisoner in home confinement." 136 Cong. Rec. 36,930 (1990) (House); *id.* at 36,318 (Senate); *see also* Pub.L. No. 101–647, § 2902, 104 Stat. 4789, 4913 (1990).

The government's argument is that the House Report described the existing statute (3624(c) without the home detention)—that the BOP "can only" place an inmate in community confinement during the statutory period outlined in § 3624(c)—and that Congress's rejection of the initial amendments eliminating the time restrictions confirms that understanding of the statutory framework.

■■ The argument flies in the face of principles of statutory construction, and

home custody or whatever, so they would not have had to have served a day in prison. 136 Cong. Rec. H8842–04, H8917 (1990). Of course, the substance of floor debate is still less reliable as an interpretive guide than would be a house report, which itself pales beside unambiguous language. *See, e.g., Landgraf v. USI Film Prods.*, 511 U.S. 244, 262 & n. 15, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (discounting the interpretive value of "frankly partisan statements" made during legislative debate); *Zuber v. Allen*, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969) (observing that floor debate at best gives insight into the understanding of individual legislators). The government's far from comprehensive legislative exegesis of § 3621(b)—accomplished through a selective excavation of the amendment history of *another* statute—invites the comparison that Judge Leventhal of the D.C. Circuit has drawn likening legislative history citations to "looking over a crowd and picking out your friends." Patricia Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court*

existing case law. A court is not supposed to consult legislative history where, as here, the meaning of a statute is clear from its plain language. *See United States v. Charles George Trucking Co.*, 823 F.2d 685, 688–89 (1st Cir.1987) ("In the case before us, the statutory command is clear as a bell—and its melody is unmuffled by any discordant legislative undertone.") (citing *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)). The plain language of § 3624(c) places no curbs on BOP discretion as to place of confinement prior to the last six months or 10% of confinement. The provision's purpose is not to set strict conditions on when the BOP *can* designate a prisoner to community confinement. The statute in fact burdens the BOP with a duty (albeit a "qualified" one). *Prows v. Federal Bureau of Prisons*, 981 F.2d 466, 469 (10th Cir.1992); *Howard*, 248 F.Supp.2d at 544; *Ferguson v. Ashcroft*, 248 F.Supp.2d at 572. It *"shall"* take steps to *"assure"* that prisoners serve the last 10 percent[11] of their prison terms

*Term*, 68 Iowa L.Rev. 195, 214 (1983) (paraphrasing Judge Leventhal); *see also Conroy v. Aniskoff*, 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring in the judgment) (same).

**11.** I agree with the government and Judge Lasker's order in *Kennedy v. Winn*, Civ. No. 03–10568–MEL (D.Mass. July 9, 2003) (slip op.), that the time-frame set down for § 3624(c) action could not be plainer: the statute applies for six months or the last 10 percent of a prisoner's term, whichever is shorter. In a posture similar to Mr. Pereira's, the defendant in *Kennedy* was assigned an original release date into community confinement six months before the end of his prison term. After the DAG Opinion issued, the BOP pushed back that date so that Kennedy would serve only the last 10 percent of his imprisonment in Coolidge House. Judge Lasker held that Kennedy was not entitled to that earlier release date.

The *Kennedy* analysis stops short, however—it recognized that § 3624(c) did not *re-*

"under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community." What one statute, § 3624(c), requires and another, § 3621(b), allows the BOP to do are two separate matters. It is illogical and inappropriate to infer that where the mandate that § 3624(c) places upon the BOP at the end of a prisoner's sentence stops, a limitation on its discretion for the period before that begins. The Tenth Circuit made that much clear in *Prows:* "Nothing in § 3624(c) indicates any intention to encroach upon the Bureau's authority to decide where the prisoner may be confined during the pre-release period." *Prows,* 981 F.2d at 469. All that § 3624(c) suggests is that whatever the conditions of confinement were prior to the last 10 percent of a prisoner's term (not to exceed six months), the remaining period is to be served under pre-release conditions.

It is important to note further that § 3624 does not and never did mandate pre-release into community or home confinement. *Id.* (explaining that the statute provides only a "general direction to facilitate the prisoner's post-release adjustment through establishment of some unspecified pre-release conditions"). Accordingly, courts have held that a prisoner is not entitled to sue under § 3624(c) solely because the phase-in program settled upon by the BOP is not to his liking. *Id.* at 469–70; *United States v. Laughlin,* 933 F.2d 786, 789 (9th Cir.1991). The *Prows* court in fact suggested that not only is the BOP's discretion in selecting transitional programs that § 3624(c) requires consistent with a broad view of its powers of placement under § 3621(b), that responsibility *depends upon* its § 3621(b) discretion:

> [O]ur interpretation of § 3624(c) as a legislative directive focusing on the development of conditions to facilitate the inmate's adjustment to free society, whatever the institution of pre-release confinement, accepts as a premise that the broader statutory scheme concerning the Bureau's general placement authority remains intact and effective.

*Prows,* 981 F.2d at 470.

Confronted with the government's attempt to leverage § 3624(c) to support the

---

*quire* that the BOP do anything until Kennedy met the 10 percent marker, and stopped there. Left to consider is whether the BOP was *allowed* to move Kennedy into community confinement under § 3621(b). Section 3624(c) requires the BOP to take steps to transition the prisoner back into society (steps that may, in its discretion under § 3621(b), include release into community or home confinement programs, as well as other meaningful gestures at pre-release transitioning devised or sponsored by the BOP). It does not require that the BOP send prisoners to community confinement during the phase-in period, and it requires nothing of the BOP outside that period. Likewise, however, it does not curtail the BOP's discretion under § 3621(b), vindicated in this decision, in *Iacaboni,* and elsewhere around the nation, to move prisoners into community confinement as and when appropriate.

Given the crystal-clear language of § 3624(c), I can only conclude that the BOP's regular practice of releasing prisoners into Coolidge House at the six-month mark—and not the 10 percent mark—of their sentences constituted an exercise of the discretion afforded to the Bureau under § 3621(b). Indeed, the DAG Opinion seems to confirm this—as it speaks in the language of § 3621(b) on this issue (what the BOP is allowed to do), and not § 3624(c) (what it is required to do). DAG Opinion at 1 ("[The BOP] has asked us to advise you whether BOP has general authority, either upon the recommendation of the sentencing judge or otherwise, to place such an offender directly in community confinement at the outset of his sentence or *to transfer him from prison to community confinement during the course of his sentence.* We conclude below that the BOP has no such general authority.") (emphasis added).

DAG Opinion, the *Howard* and *Ferguson* courts wryly observed:

> This portion of the Government's rationale is almost worth preserving for the marvelous irony it foists upon the world. As the court reads this subsection, Congress is directing the Bureau to do its level best to assure that everyone who has served time get a decent opportunity to go through a period of readjustment before being thrust back into the community.
>
> Yet, the Government would have the court read this section as a stiff curb on the Bureau's ability to make such placements at all. The court finds this reading to be implausible. The statute clearly emphasizes the Bureau's duty to ensure a reasonable opportunity for a period of adjustment. It aims to relieve the burdens of direct release on our communities, the inmates, and their families.

*Howard,* 248 F.Supp.2d at 544, *Ferguson,* 248 F.Supp.2d at 572.

Second, this House Report was compiled by a session of Congress *subsequent* to the one that enacted the statute in the first instance. As such, it gives no insight into the legislative intent of the section's drafters. If anything, the House Report furnishes a *post hoc* interpretation of existing legislation, to be accorded no greater weight than the considered judgment of the federal courts in *Prows, Laughlin,* and the more recent *Howard* and *Ferguson* cases.

Section 3621 places federal inmates firmly within the custody of the Bureau of Prisons for their terms of imprisonment and affords the BOP ample discretion to determine the appropriate location to exercise that custody. No other provision in the United States Code (and certainly nothing in the Sentencing Guidelines) purports to curb that discretion.

## B. *Administrative Procedure Act*

A number of courts also have concluded that, whatever its substantive merit, the new BOP Policy is invalid for failure to comply with the "notice and comment" rulemaking requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq. See, e.g., Iacaboni,* 251 F.Supp.2d at 1038–40; *Ferguson,* 248 F.Supp.2d at 564–65; *Mallory,* 2003 WL 1563764, at *2; *McDonald,* slip op. at 12–18. I agree with those decisions.

■ There is no dispute that the BOP adopted its new "rule" [12] regarding community confinement without engaging in the rigorous "notice and comment" procedures set forth in the APA, 5 U.S.C. § 553. It is equally indisputable that, unless an agency rule is of a type excepted from the APA, violation of these procedural prerequisites renders it invalid. *See Auer v. Robbins,* 519 U.S. 452, 459, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).

■ Here, the government contends that the BOP policy at issue is not a substantive or "legislative" rule but rather is a mere "interpretative rule" that is exempt from notice and comment requirements. *See Warder v. Shalala,* 149 F.3d 73, 79 (1st Cir.1998) ("The APA exempts 'interpretive rules' from its notice and comment procedures.") (citing 5 U.S.C. § 553(b)(3)(B)). After careful consideration, I must reject the government's position because the new policy places sweeping limitations on BOP discretion that are not self-evident in the statute and that

---

**12.** The APA broadly defines "rule" to include "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

purport to have binding legal effect on both BOP personnel and third parties (*i.e.,* judges and defendants) alike.

As the First Circuit has recognized, "the line between a legislative or substantive rule and an interpretative one is ... far from clear." *Id.* Indeed, courts over the years have described the distinction as " 'fuzzy,' 'tenuous,' 'blurred,' 'baffling,' and 'enshrouded in considerable smog.' " Richard J. Pierce, Jr., *Distinguishing Legislative Rules from Interpretative Rules,* 52 Admin. L.Rev. 547, 547–48 (2000) (collecting cases). Even a comprehensive attempt by the D.C. Circuit to reconcile this body of case law in *American Mining Congress v. Mine Safety & Health Admin.,* 995 F.2d 1106 (D.C.Cir.1993) (listing factors to consider such as the agency's intent, publication in CFR, inconsistency with prior legislative rule, *etc.*) was less than successful. *See* Robert A. Anthony, *"Interpretive" Rules, "Legislative" Rules, and "Spurious" Rules: Lifting the Smog,* 8 Admin. L.J. Am. U. 1, 16 (1994) (noting that *American Mining* formulated ten tests and rejected three others). I endeavor to apply this diverse body of law not merely by listing the criteria and checking them off, but by anchoring my analysis to functional considerations and the APA's underlying rationale.

It is helpful to begin with the origins of the legislative/interpretative distinction in the legislative history of the APA. Courts routinely cite the 1947 *Attorney General's Manual on the Administrative Procedure Act* as a "key document," *American Mining,* 995 F.2d at 1109, that contains the "most authoritative" account of that history. *Warder,* 149 F.3d at 79–80. It offers the following "working definitions":

> *Substantive [or legislative] rules*—rules ... issued by an agency pursuant to statutory authority and which implement the statute .... Such rules have the force and effect of law.
>
> *Interpretative rules*—rules or statements issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers ....
>
> *General statements of policy*—statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.

*American Mining,* 995 F.2d at 1109 (quoting the *Attorney General's Manual*). Standing alone, of course, these definitions are only marginally illuminating because it is easy enough to imagine, for example, that a rule could both "construe" and "implement" a statute, all the while advising the public about how the agency intends to perform a certain discretionary function.

Courts and commentators appear to agree that the most important question is "whether the disputed rule has 'the force of law.' " *Id.* A "rule with the force and effect of law—binding not only on the agency and regulated parties, but also on the courts—is by definition a substantive rule." *Warder,* 149 F.3d at 82. Conversely, interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Shalala v. Guernsey Memorial Hosp.,* 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995); *see also* Charles H. Koch, Jr., 1 *Admin. L. & Prac.* § 4.11 (2d ed. 2003) ("[L]egislative rules are binding on courts as an extension of legislative power, whereas interpretative rules have only the effect courts choose to give them."); 2 Am.Jur.2d Administrative Law § 161 (2003) ("Interpretive rules are not intended to have any legal effect and do not have the force and effect of law. Accordingly, an interpretive rule is not binding on a court, which may disagree with an

administrator's interpretation of a statute .... ").

In determining whether a rule carries the "force of law," the "critical factor" is "whether it le[aves] the agency officials free to exercise discretion in an individual case" or instead requires a uniform, predetermined outcome that admits of no exception. *Koch, supra,* § 4.11. The reason for the dichotomy appears to be a concern with the democratic legitimacy of agency action.

> Under the established rulemaking system, the agencies trade abbreviated procedures for limited effect when they choose nonlegislative rules. The practical implication of this choice is clear. Where the nonlegislative rule articulates an enforcement strategy, the regulated can wait for enforcement secure that a court will be able to substitute judgment on the rule in reviewing the enforcement. For example, if the FTC issues a nonlegislative rule saying that it feels the failure to post octane ratings is a violation of its Act, the gasoline company may either be guided by the rule or, if they choose to challenge the rule, continue not to post ratings and await enforcement. In the latter case, they will be secure in the knowledge that the agency will have to demonstrate to a court the justification for its rule. On the other hand, if the FTC chooses a legislative rule the oil companies would know that review had been confined even though they would have the opportunity to participate in public rulemaking. In the former case, the company will know how to comply with the law as viewed by the

FTC; whereas in the latter case it will also be more directly controlled by the rule.

*Id.*

In other words, procedural mechanisms exist as democratic "checks" on the delegated power of administrative agencies in promulgating both legislative and interpretative rules. Legislative rules are shaped through notice and comment but thereafter are entitled to deference in the courts under the principles of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (setting forth the familiar two-step test for judicial deference to an agency's legislative rule). Interpretative rules, meanwhile, are subject to multiple layers of review in agency adjudication and much more expansive review in the courts. *See United States v. Mead Corp.,* 533 U.S. 218, 221, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (confirming that *Chevron* deference does not apply to nonlegislative rules).[13]

It therefore should come as no surprise that recent First Circuit cases that have found rules to be "interpretative" involved statements of statutory construction that set standards to be applied to specific facts in the course of agency adjudication. For example, *Warder* (on which the government relies heavily in this case) involved an interpretive rule defining durable medical equipment in Medicare reimbursement proceedings. 149 F.3d at 76. Applying *Warder, Aviators for Safe and Fairer Regulation, Inc. v. Federal Aviation Admin.,* 221 F.3d 222 (1st Cir.2000), involved the definition of "rest" as applied to certain

---

**13.** If the BOP prevails on the argument that its new policy is merely an "interpretative rule," then its construction of the statute actually will be entitled to *less* judicial deference than it otherwise might be. Because the government did not assert that the new policy is entitled to *Chevron* deference, I did not under-

take a *Chevron* inquiry in Section IV.A. Even if I had conducted a *Chevron* inquiry, however, I would have concluded that the BOP policy is not a "permissible construction of the statute[s]" at issue. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

factual situations in FAA regulatory enforcement proceedings. The rules at issue in both cases provided guidance for agency decisionmaking in specific situations. They did not "create[ ] rights, assign[ ] duties, or impose[ ] obligations, the basic tenor of which is not already outlined in the law itself." *Warder*, 149 F.3d at 80.

The "rules" at issue in the above cases stand in stark contrast to the BOP policy at issue here, as Judge Woodlock observed:

> [I]t is apparent that application of a general legislative rule, rather than a specific adjudicative ruling, is involved in the attempted redesignation of [defendants from community confinement to secure facilities]. This is no mere effort at interpretive guidance but rather a rulemaking exercise designed to reshape the scope of a statutory provision through an administrative statement of lawmaking.

*Mallory*, 2003 WL 1563764, at *2; *see also Ashkenazi*, 246 F.Supp.2d at 7 n. 9 ("[I]rrespective of the BOP's characterization of its policy, the new policy has the force of law and is not merely interpretive .... The new policy is [ ] not flexible and does not permit BOP to exercise any discretion."); *cf. Martin v. Gerlinski*, 133 F.3d 1076, 1079 (8th Cir.1998) (holding that a

BOP definition of "nonviolent offense" was legislative because it did not merely "explain" statutory meaning but "expanded" the reach of a regulation to bar offenders from early release).[14]

In attempting to classify this rule as "interpretative," while affording concerned parties no opportunity for meaningful input and simultaneously insisting that the rule admits of no exception and is legally binding on the BOP, defendants, and judges, the government is trying to "have its cake and eat it too." This position is especially troubling here—because of its timing, its peremptory nature, and its source, the Department of Justice, which harbors an inherent conflict of interest as the BOP's "lawyer" and as a party advocate in criminal proceedings.

## C. *Retroactive Application of the Policy*

A change in law has retroactive effect when it "attaches new legal consequence to events completed before its enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269–70, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The retroactive application of laws, under certain (but not all) circumstances, can work harm of constitutional significance. Specifically, such a

---

**14.** It is of no consequence that the BOP's prior conclusion that it could place offenders directly into community confinement, reflected in Program Statement No. 7300.09, § 5.3.3, was not a "legislative" rule adopted through notice and comment. The prior practice did not "bind" anybody and simply announced the manner in which the BOP intended to exercise discretion under its statutory duty of designating offenders to facilities, a classic example of a general statement of policy or legislative rule. The new rule, in contrast, purports to be legally binding and dramatically curtails the BOP's discretion in a way that is not obvious in the law itself.

The government's reliance on *Reno v. Koray*, 515 U.S. 50, 115 S.Ct. 2021, 132

L.Ed.2d 46 (1995), is also misplaced. That case upheld the BOP's policy of not crediting pretrial time spent in community confinement as "official detention" for purposes of sentence credit, while it simultaneously confirmed that time in community confinement under BOP custody *would* count. While the Court mentioned in dicta—drawn from dicta in the lower court's opinion—that the Program Statement containing the credit policy was "interpretive," the case says nothing of import about how the legislative/interpretative distinction applies here. *See Iacaboni*, 251 F.Supp.2d at 1040; *Wiggins v. Wise*, 951 F.Supp. 614, 620 n. 4 (S.D.W.Va.1996).

practice can offend the principles of due process and the Constitution's proscription of *ex post facto* laws. *Id.* at 266, 114 S.Ct. 1483. I find that the BOP policy does both.

### 1. Ex Post Facto Clause

■ Section 9 of Article I of the United States Constitution, which enumerates the powers of Congress, provides that "no Bill of Attainder of ex post facto Law shall be passed." [15] The Supreme Court has long held that an *ex post facto* law is one that "retroactively alter[s] the definition of crimes or increase[s] the punishment for criminal acts." *Cal. Dep't of Corrections v. Morales,* 514 U.S. 499, 504–05, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (citing, *inter alia, Calder v. Bull,* 3 U.S. (3 Dall.) 386, 391–92, 1 L.Ed. 648 (1798)). To succeed, an *ex post facto* challenge must show that the law in question "applies to conduct completed before its enactment" and that "it raises the penalty from whatever the law provided when he acted." *Johnson v. United States,* 529 U.S. 694, 699, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000).

■ The government argues that the BOP policy change does not "increase" an offender's punishment; it only alters its conditions. Yet the inevitable result of that alteration is to make it more punitive. *See Iacaboni v. United States,* 251 F.Supp.2d 1015, 1041–42 (D.Mass.2003) ("[T]he progression from a sentence with eligibility for possible community confinement to one without the remotest possibility of such eligibility constitutes a *significant increase in the measure of punishment* for the offenses they pled guilty to. It is hard to imagine any fairminded argument to the contrary, except from someone blind to the realities of imprisonment." (emphasis added)).

■ It cannot be that the Ex Post Facto Clause only forbids retroactive gestures that make *quantitative adjustments* to criminal penalties, *i.e.,* increases in the length of sentences and the amount of fines imposed. Were that the case, a government could retroactively apply a law mandating solitary confinement for certain prisoners—a position that the Supreme Court flatly rejected over a century ago. *See In re Medley,* 134 U.S. 160, 171, 10 S.Ct. 384, 33 L.Ed. 835 (1890) ("It seems to us ... that the solitary confinement to which the prisoner was subjected by the statute ... was an additional punishment of the most important and painful character, and is therefore forbidden by this provision of the constitution of the United States.").

The BOP next contends that at no point in the criminal process are federal defendants or prisoners guaranteed community confinement. It takes the position that there is no constitutional fault to a retroactive law that takes prisoners from "some possibility" to "no possibility" of release into community confinement. And indeed, the Supreme Court has made clear that the Ex Post Facto Clause does not proscribe any and every law that carries the remotest risk of altering an existing prisoner's punishment. *Morales,* 514 U.S. at 508, 115 S.Ct. 1597. The consequence of so extreme a position would be too great— potentially invalidating a number of reasonable restrictions on prisoners, including, for example, limitations on access to law libraries. *Id.*

*Morales* ultimately held that the state law before the Court, which authorized a

---

**15.** A second Ex Post Facto Clause, lodged in Section 10 of Article I, is enforceable against the states. U.S. Const. art. I, § 10, cl. 1 ("No state shall ... pass any ... ex post facto Law ....").

state parole board to scale back the frequency of its hearings, admitted "only the most speculative and attenuated possibility" of a retroactive increase in punishment. *Id.* at 509, 115 S.Ct. 1597 ("[S]uch conjectural effects are insufficient under any threshold we might establish under the Ex Post Facto Clause."). The Court observed that demarcation of the bounds of the Ex Post Facto Clause's coverage required principled line-drawing—in essence, the analysis reduces to "a matter of degree." *Id.* (quoting *Beazell v. Ohio,* 269 U.S. 167, 170, 46 S.Ct. 68, 70 L.Ed. 216 (1925) ("[T]he constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation, and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance.")).

But one need not rely on the same speculation, conjecture, or attenuated chain of cause and effect to come to a different conclusion in this case—that the DOJ's clampdown on BOP discretion as to place of imprisonment increases punishment for prisoners. *Iacaboni,* 251 F.Supp.2d at 1041 (observing that the BOP's policy change presents a situation "entirely different" from that in *Morales*—the risk of increased punishment "is not at all speculative"). The BOP had a clear and consistent policy of accepting (or at least considering) judicial recommendations of community confinement at the outset of the sentence and releasing prisoners into such facilities six months before the end of their terms. *Ashkenazi,* 246 F.Supp.2d at 7 (observing further that the BOP's routine exercise of its discretion as to place of confinement gave rise to an "understanding" among federal judges

that the Bureau would at least consider its recommendations before accepting or rejecting them). Through the lawmaking of its counsel, the BOP has instituted a wholesale reversal of that policy. No one is to go into community confinement—not at the beginning of their sentence, not in the middle. The only time transfer is somehow lawful is the last 10 percent of his term of imprisonment, and not, of course, to exceed six months.[16]

Admittedly, a judicial recommendation of community confinement does not guarantee a placement there; nor was the BOP bound by law to install prisoners in such facilities for the last six months of their terms. But this does not affect the *ex post facto* analysis. *Id.* at 3–4 (finding a prisoner to have made a strong showing of likelihood of success on his claim that the BOP policy change violated the Ex Post Facto Clause) (citing *Lynce v. Mathis,* 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997)).

In *Lynce* the Supreme Court found that the retroactive cancellation of early release credits violated the Ex Post Facto Clause. *Lynce,* 519 U.S. at 449, 117 S.Ct. 891. The fact that a prisoner was not necessarily entitled to the credits when he pleaded guilty made no difference to the Court. The new policy "made ineligible for early release a class of prisoners who were previously eligible." *Id.* at 446, 117 S.Ct. 891. The elimination of that *eligibility*—notwithstanding that it came with no *guarantee*—was sufficient to offend *ex post facto* principles.

The BOP's decision to strike community confinement from its menu of prison options invites a comparison with *Lynce,* as the *Ashkenazi* court noted:

16. And, as I have noted, the government's position that community confinement is appropriate at this stage is flatly inconsistent with the reading of § 3621(b) that the DOJ

impressed upon the Bureau. If community confinement counts for "prison" in the waning days of one's sentence, it counts for "prison" throughout.

Just as it was irrelevant in *Lynce* that the petitioner did not have a reasonable expectation of receiving the early release credits at the time he pled guilty, so it is irrelevant here that Ashkenazi had no guarantee that BOP would determine that he should serve his full sentence in a CCC. As in *Lynce*, Ashkenazi has been "unquestionably disadvantaged" by the new BOP policy. As a result of this policy, Ashkenazi is now ineligible not only to have the BOP exercise its discretion to determine where to place him, but to actually serve his sentence in a halfway house.

*Ashkenazi*, 246 F.Supp.2d at 6; *see also Iacaboni*, 251 F.Supp.2d at 1041.

Nor does it matter that the "law" charged to be *ex post facto* is not a congressional enactment, but a revision of agency policy. The Supreme Court held recently, in *Rogers v. Tennessee*, 532 U.S. 451, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001), that the Clause "is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government." *Id.* at 456, 121 S.Ct. 1693. The Court has yet to comment, however, on the applicability of the Ex Post Facto Clause to agency rulemaking. In *Hamm v. Latessa*, 72 F.3d 947 (1st Cir.1995), the First Circuit observed in *dictum:*

> [A]lthough the Supreme Court has not addressed the question of whether an administrative policy or regulation can be an ex post facto law, a number of courts have held that binding administrative regulations, as opposed to those that serve merely as guidelines for discretionary decisionmaking, are laws subject to ex post facto analysis.

*Id.* at 956 n. 14 (citing *Akins v. Snow*, 922 F.2d 1558, 1561 (11th Cir.1991), *Rodriguez v. United States Parole Comm'n*, 594 F.2d 170, 174 (7th Cir.1979), and *Love v. Fitz-*

*harris*, 460 F.2d 382, 385 (9th Cir.1972)). The *Hamm* court unearthed other cases that "can be read" to hold that agency rules are not "laws" for purposes of Ex Post Facto Clause analysis, *e.g., Kelly v. Southerland*, 967 F.2d 1531, 1532–33 (11th Cir.1992); *Inglese v. United States Parole Comm'n*, 768 F.2d 932, 936 (7th Cir.1985), but these cases involved Parole Commission Guidelines and therefore had no occasion to distinguish between non-binding guidelines (not "laws") and binding regulations ("laws").

It is beyond dispute that the BOP's recasting of § 3621(b), which strips it of its discretion in determining an inmate's place of confinement, has the binding effect of law. The DAG Opinion to the BOP certainly appears to have trumped non-binding judicial recommendations. Given this result I would be hard pressed to view the policy change as anything other than law that binds the hands of the BOP.

Finally, the government argues that the DAG Opinion only corrected the BOP's "erroneous interpretation of preexisting law." Such corrections, it contends, do not violate the Ex Post Facto Clause. *See Metheny v. Hammonds*, 216 F.3d 1307, 1310–11 (11th Cir.2002) (citing cases in the Second, Fourth, Fifth, and Tenth Circuits); *see also Stephens v. Thomas*, 19 F.3d 498, 500 (10th Cir.1994) (finding that a department of corrections' suspension of good-time credit deemed unlawful under a statute did not violate the Ex Post Facto Clause); *Mileham v. Simmons*, 588 F.2d 1279, 1280 (9th Cir.1979) ("The Ex post facto clause of the Constitution does not give [an inmate] a vested right in . . . an erroneous interpretation [of law].").

The *Ashkenazi* court ably addressed this position as well. That court noted that in *Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), the Supreme Court held that "a law need not impair a

'vested right' to violate the *ex post facto* prohibition." *Ashkenazi,* 246 F.Supp.2d at 6 (quoting *Weaver,* 450 U.S. at 29, 101 S.Ct. 960). Rather, the *Weaver* Court observed:

> Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.

*Weaver,* 450 U.S. at 30, 101 S.Ct. 960. Taking *Weaver's* cue, courts have found that "administrative rules that purport to correct or clarify a misapplied existing law" can violate the Ex Post Facto Clause. *Ashkenazi,* 246 F.Supp.2d at 6 (citing, *inter alia, Knuck v. Wainwright,* 759 F.2d 856, 859 (11th Cir.1985)) (finding that the Department of Corrections' policy change in "gain time" calculations, though interpretive, violated the Ex Post Facto Clause because it conflicted with 10 years of "established practice and regulations").

Here, where the BOP has for at least seventeen years "continually exercised [its] statutorily prescribed discretion" to place prisoners in community confinement facilities, *Ashkenazi,* 246 F.Supp.2d at 7, the DOJ's sneak attack on BOP discretion unequivocally burdens *Weaver's* principle of fair notice. The rule change in *Knuck* was at least occasioned by a statutory amendment that invited (although it did not mandate) the revision at issue. The new BOP Policy, as I have observed, arrived out of the blue, during the holidays, without notice, comment, or legislative rumbling, to turn seventeen years' practice on its head. *Ashkenazi,* 246 F.Supp.2d at 7 ("Here, the change in BOP policy prohibiting it from exercising its discretion to determine a prisoner's place of confinement was not foreseeable.").

The Ex Post Facto Clause simply forbids retroactive application of the BOP policy change to prisoners whose offense conduct predated the change.

### 2. *Due Process*

■ The Fifth Amendment forbids the federal government from depriving a person of his right to life, liberty, or property without due process. U.S. Const. amend. V. Among the numerous safeguards that due process principles provide is a protection against certain forms of retroactively applied law. Due process "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Landgraf,* 511 U.S. at 266, 114 S.Ct. 1483.

■ A law does not implicate due process unless it bears on a person's life, liberty, or property interest. *Am. Mfrs. Mutual Ins. Co. v. Sullivan,* 526 U.S. 40, 60, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); *Neitzke v. Williams,* 490 U.S. 319, 321–22, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). The First Circuit has held that an inmate has no liberty interest in continued participation in a work release program. *Dominique v. Weld,* 73 F.3d 1156, 1159–61 (1st Cir.1996). The *Dominique* court cited the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), where the Supreme Court held that a prisoner's liberty interest is implicated only when government action "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484, 115 S.Ct. 2293.

■ It was the First Circuit's view that transfer to more restrictive conditions did not impose an "atypical" hardship: the conditions were "no different from those ordinarily experienced by large numbers of other inmates serving their sentences in customary fashion." *Id.* at 1160; *see also*

*Lyle v. Sivley*, 805 F.Supp. 755, 760 (D.Ariz.1992) (finding that notwithstanding the dictates of § 3624(c), an inmate had no constitutional liberty interest in transfer to a less restrictive environment) (citing *Hewitt v. Helms*, 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (holding that an inmate had no liberty interest in avoiding transfer to a more restrictive facility)). A prisoner cannot level a due process challenge to the BOP policy reversal on the ground that he was unlawfully deprived of a liberty interest in community confinement.

■ However, the law does recognize a due process right not to be sentenced on false information. *Roberts v. United States*, 445 U.S. 552, 556, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980); *United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); *see also United States v. Montoya*, 967 F.2d 1, 2 (1st Cir.1992) (recognizing that the accuracy of information before the sentencing judge bears on the "fundamental fairness" of the proceeding); *United States v. Rone*, 743 F.2d 1169, 1171 (7th Cir.1984) ("Convicted defendants, including those who plead guilty, have a due process right to a fair sentencing procedure which includes the right to be sentenced on the basis of accurate information.") (citing *Tucker*). The misinformation, the *Tucker* Court held, must be of "constitutional magnitude." *Tucker*, 404 U.S. at 447, 92 S.Ct. 589.

At least eight courts in published decisions have found this doctrine appropriate to apply in the present situation, where a trial court sentenced with the understanding—and often with express assurance from BOP representatives—that a prisoner would be eligible for community confinement at some point prior to the last 10 percent of his term. The *Iacaboni* court, revisiting a sentence it had itself given, observed:

> In imposing this sentence, again, I relied on explicit information given to me to the effect that the BOP would consider carefully and, when appropriate, adopt judicial recommendations to community confinement. Had I known that this information was false, and that McKenzie would face automatic transfer to a distant, high security facility, with the resulting catastrophe to his children, my sentence almost certainly would have been different.

*Iacaboni*, 251 F.Supp.2d at 1020–21 (finding that the BOP's sloughing of its discretion violated due process in sentencing).

In *Culter* the court, assuming *arguendo* that the government's "correction" of its § 3621(b) interpretation was statutorily warranted, held nonetheless that "the government's long-standing alleged misinterpretation of the law, and the reliance induced by that misinterpretation, now precludes the government from retrospectively correcting its mistake by sending petitioner to prison." *Culter*, 241 F.Supp.2d at 25–26 (citing *DeWitt v. Ventetoulo*, 6 F.3d 32, 35 (1st Cir.1993)). Other courts have upheld due process challenges. *See, e.g., Pearson*, 265 F.Supp.2d at 979–83; *Tipton*, 262 F.Supp.2d at 637; *Byrd*, 252 F.Supp.2d at 303; *West*, 2003 WL 1119990, at *4.[17]

---

**17.** Two other cases to address the community confinement issue suggest that relief to prisoners could well be available on this theory, *United States v. Kramer*, 2003 WL 1964489 (N.D.Ill., Apr.28, 2003), and *United States v. James*, 244 F.Supp.2d 817 (E.D.Mich.2003), found simply that it was not viable on the facts before those courts. That is, the courts—which in both cases reviewed the claims of prisoners they themselves had sentenced—found no due process violation because the preexisting BOP policy was not material to their sentencing decisions. *Kramer*, 2003 WL 1964489 at *3 ("[T]he Court

In cases in other districts—*Pearson* and *Culter*, most notably—the government has objected that *United States v. Addonizio*, 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805, bars due process relief on this theory. *Addonizio* in fact held that a collateral attack—via 28 U.S.C. § 2255—on the lawfulness of a sentence must be predicated on an "objectively ascertainable error," and not merely the "frustration of the subjective intent of the sentencing judge." *Id.* at 187, 99 S.Ct. 2235. No such limitation is placed on a challenge to the conditions of a sentence under § 2241. Moreover, as the *Pearson* and *Culter* courts observed, the petitioner in *Addonizio* did not expressly articulate a due process challenge,[18] and further, "there was no suggestion in *Addonizio* that 'the government had in any way misrepresented the nature of its own authority to the court,'" as is true here. *Pearson*, 265 F.Supp.2d at 979 (citing *Culter*, 241 F.Supp.2d at 26 n. 7).

For that matter, an argument can be made that a sentencing court's reliance on the BOP's longstanding policy—assuming that it were, as the government contends,

a misinterpretation of § 3621(b)—resulted in a sentence infected with "objectively ascertainable error." *Iacaboni* so held, pointing to the "error" of Judge Ponsor's "assumption ... that all three of these petitioners would be eligible for possible designation to a community confinement facility." *Id.* at 1042. That is, the BOP's exercise of its place-of-confinement discretion to thwart a sentencing judge's intent would not be actionable, but a sentence materially altered by the judge's "erroneous" view that BOP had any discretion at all, such that community confinement was at all a *possibility*, would pass muster to permit a § 2255 suit under *Addonizio* citing due process principles.[19] *See also Pearson*, 265 F.Supp.2d at 980 ("Misinformation regarding the manner in which a sentence will be executed may provide a basis for relief as well.").

▮ Due process principles provide an independent ground to challenge the BOP policy reversal, at least for those prisoners whose sentences took existing policy into account.[20]

*Pearson*, 265 F.Supp.2d at 980 (citing *Culter*, 241 F.Supp.2d at 27 n. 7).

accepted the parties' agreement to a nine month prison term without regard to the possibility that Kramer would be designated to a CCC. Put another way, we would have imposed exactly the same sentence even if the former policy of CCC designation had not existed."); *James*, 244 F.Supp.2d at 819 ("[T]his Court did not rely on any false information in passing sentence.... [E]ven if the information concerning the BOP was accurate at the time of sentencing in this case, the outcome would be identical: the Court would have sentenced Defendant–Petitioner to an imprisonment term of one year and one day.").

18. It is the view of the *Pearson* and *Culter* courts that a due process claim against retroactive application of the BOP's new policy is available even under § 2255, notwithstanding *Addonizio*, because such a claim "is explicitly a constitutional one, and thus fits comfortably within the traditional rubric of ... § 2255."

19. The cases to date that have found no due process violation tend not to recognize this distinction.

20. The time-triggers of Ex Post Facto and Due Process Clause protection differ in this context. The Ex Post Facto Clause protects a prisoner from changes in the law that occur after he commits the crime. The BOP policy change only offends due process principles insofar as the altered conditions of a prisoner's sentence were not known to the sentencing court. As a result, where a defendant's offense conduct predated the policy change but his plea and sentencing occurred after the change, only *ex post facto* principles bar retroactive application of the BOP policy. Thus, due process concerns are implicated in the cases of Sardinha, Monahan, and Pereira. With respect to Costello and Silveira, the

## V. CONCLUSION

For the foregoing reasons, I find that the BOP's post-December 2002 policy with regard to community confinement is legally invalid.

█ For purposes of the injunctions at issue in Monahan and Sardinha's cases, the petitioners have fulfilled the legal prerequisites. My analysis above demonstrates clear likelihood of success on the merits. Improperly subjecting offenders to prison rather than community confinement inflicts irreparable harm on them, their families, and their communities. Recognition of the discretion to utilize community confinement inherent in the BOP's pre-December 2002 policy poses no special burdens on the government. And maintaining a full menu of appropriate punishment options is in the public interest. *See Utility Contractors Ass'n of New England, Inc. v. City of Worcester*, 236 F.Supp.2d 113, 117 (D.Mass.2002) (laying out the above prerequisites for injunction).

Pereira's situation is different, because questions have been raised with respect to his eligibility for community confinement even prior to the December policy. In the case of Costello and Silveira, this analysis will be adopted in sentencing memoranda to be issued forthwith.

Separate, appropriate orders consistent with these findings will be issued (or have been issued) in each of the above-captioned cases.

**SO ORDERED.**

Court sentenced after the policy change and expressly departed downward to compensate for the BOP's unlawful policy. An Ex Post

Facto analysis applies to all of the individuals whose cases are addressed in this Memorandum.